## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, TENNESSEE, TEXAS, VIRGINIA, and WISCONSIN, *ex rel.* MICHAEL YARBERRY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No.  3:09-cv-00588 |
| Plaintiffs, | ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| v. | ) ) ) | **JURY TRIAL DEMAND** |
| SEARS HOLDINGS COMPANY, INC., and KMART, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

**TABLE OF CONTENTS**

PLAINTIFFS' FIRST AMENDED COMPLAINT WITH JURY DEMAND .............................. 1

I.     INTRODUCTION ............................................................................................. 1

II.    PARTIES .......................................................................................................... 1

III.   PRELIMINARY STATEMENT OF DEFENDANTS' FRAUDULENT CONDUCT ... 2

IV.    BACKGROUND ............................................................................................... 2

   A.   *Government Program Reimbursement to Providers  For Prescription Drugs Dispensed to Program Beneficiaries* ........................................................................ 2

   B.   *The Emergence of Deeply Discounted Prices for Some Generic Drugs* ................... 3

   C.   *Defendants' Phantom Carrier Schemes: Matching Competitors' Lower U&C Prices Without Giving Up Higher APT Reimbursements* ................................................ 4

   D.   *Monetary Incentives to Purchase Prescription Drugs from Defendants: The Kickback Schemes* ........................................................................................ 5

V.     JURISDICTION AND VENUE .......................................................................... 5

VI.    VOLUNTARY DISCLOSURE .......................................................................... 6

VII.   DEFENDANTS' FRAUDULENT CONDUCT ..................................................... 6

   A.   *Overview* ..................................................................................................... 6

   B.   *Scope of Fraud* ............................................................................................ 8

   C.   *Defendants' False Claims for Excessive GHP Generic Prescription Drug Payments* .. 9

      1.   Overview of GHP Prescription Drug Reimbursement Methodologies..................... 9

      2.   Specific GHP Prescription Drug Reimbursement Methodologies........................... 11

         a.   Medicare Part D Voluntary Prescription Drug Benefit Program........................ 11

         b.   Medicaid ..................................................................................... 13

         c.   TRICARE ..................................................................................... 15

         d.   FEHBP ........................................................................................ 19

      3.   Defendants' Non-formulary Based, Cash Override, 30-Day Supply Prescription Fill Scheme .......................................................................................... 23

         a.   Fall of 2006 through September 2008 ................................................. 24

         b.   Post-September 2008 Implementation of CIM ...................................... 29

         c.   Supporting Information/Internal E-mails and other communications ................ 33

d.      Representative Examples of Defendants' False Claims for 30-Day Supply Prescription Fills and Supporting Drug Movement Reports........................................ 33

(1). Comparative Examples ................................................... 35

4.      Defendants' Formulary-Based 90-Day Supply Prescription Fill Scheme ............... 40

a.      Supporting Information/Internal E-mails and other communications ................. 44

b.      Representative Examples of Defendants' False Claims for 90-Day Supply Prescription Fills and Supporting Drug Movement Reports........................................ 46

(1).      Comparative Examples ..................................................... 47

(2).      Drug Movement Report Representative Example ........................................... 51

5.      Prescription Savings Club........................................................... 51

D.      *Illegal Remunerations to Government Healthcare Program Beneficiaries* ................ 52

1.      Overview................................................................... 52

2.      Gift Card Incentive Programs .................................................. 53

3.      $1 Rewards Program........................................................... 59

4.      Coupon Matching Program ......................................................... 59

5.      Shop Your Way Rewards Program ................................................... 59

COUNT I – *FEDERAL FALSE CLAIMS ACT* ...................................................... 60

COUNT II - *CALIFORNIA FALSE CLAIMS ACT* ........................................ 63

COUNT III – *COLORADO MEDICAID FALSE CLAIMS ACT* ................................ 64

COUNT IV – *DELAWARE FALSE CLAIMS AND REPORTING ACT* ................... 64

COUNT V - *FLORIDA FALSE CLAIMS ACT* ................................................ 64

COUNT VI - *GEORGIA FALSE MEDICAID CLAIMS ACT* ........................................ 65

COUNT VII - *HAWAII FALSE CLAIMS ACT* ................................................ 65

COUNT VIII - *ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT* ................ 65

COUNT IX – *INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT* ........ 66

COUNT X - *LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW* ............... 66

COUNT XI - *MASSACHUSETTS FALSE CLAIMS ACT* ........................................ 66

COUNT XII - *MICHIGAN FALSE CLAIMS ACT* ....................................... 67

COUNT XIII – *MINNESOTA FALSE CLAIMS ACT* ..................................................... 67

COUNT XVI - *MONTANA FALSE CLAIMS ACT* ...................................................... 67

COUNT XX - *NEVADA FALSE CLAIMS ACT* ......................................................... 68

COUNT XXI – *NEW HAMPSHIRE FALSE CLAIMS ACT* .......................................... 68

COUNT XXII - *NEW JERSEY FALSE CLAIMS ACT* ................................................. 68

COUNT XXIII - *NEW MEXICO FRAUD AGAINST TAXPAYERS ACT* .................................... 69

COUNT XIX - *NEW YORK FALSE CLAIMS ACT* ...................................................... 69

COUNT XXI - *OKLAHOMA MEDICAID FALSE CLAIMS ACT* ................................................ 70

COUNT XXII - *TENNESSEE MEDICAID FALSE CLAIMS ACT* .............................................. 70

COUNT XXIII - *TEXAS MEDICAID FRAUD PREVENTION ACT* ........................................... 70

COUNT XXIV - *STATE OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT* ......................... 71

COUNT XXV - *STATE OF WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT* .................................................................................................. 71

PRAYER .................................................................................................. 71

## PLAINTIFFS' FIRST AMENDED COMPLAINT WITH JURY DEMAND

Michael Yarberry ("Relator") files this action on behalf of the United States and the States of California, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Tennessee, Texas, Virginia and Wisconsin (collectively referenced as "States" or "Plaintiff States"), against Sears Holdings Company, Incorporated ("Sears") and Kmart, Inc. ("Kmart") (when applicable, collectively referred to as "Defendants") and alleges as follows:

## I.    INTRODUCTION

1.    This is an action for damages and civil penalties on behalf of the United States of America and the States (collectively referenced as the "Plaintiffs"), through the Relator, arising from the Defendants' violations of the False Claims Act, 31 U.S.C. § 3729, et seq., as amended, and certain state statutes referenced below. The Defendants' culpable conduct, as alleged with particularity below, includes making, false claims for reimbursement from federal health care programs, using false records and statements to support those false claims, and giving monetary inducements to purchase prescription drugs reimbursable by federal health care programs.

## II.    PARTIES

2.    Sears is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois.

3.    Kmart is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois.

4.    Sears wholly owns, operates and controls Kmart, and certain nationwide Sears stores contain Kmart pharmacies.

5.    Defendants provide comprehensive pharmacy services in forty-eight (48) states within the United States.

6.    Relator is a citizen of the United States and a resident of the State of Kentucky.

7.    From 1992 to 1999, and from 2009 to the present, Relator has been employed by Defendants as a pharmacist.

## III.    PRELIMINARY STATEMENT OF DEFENDANTS' FRAUDULENT CONDUCT

8.    This is an action for damages and civil penalties arising from Defendants' violations of the False Claims Act, the federal anti-kickback statute, and the analogous false claims acts and health care fraud remedial statutes of the Plaintiff States.  Defendants' culpable conduct includes knowingly presenting false claims for payment or approval by the United States and the States; knowingly making and using false records or statements supporting or material to false claims for monetary reimbursement from the United States and the States, and providing monetary inducements to customers to purchase drugs reimbursable by federal health care programs.

## IV.    BACKGROUND

### A.  Government Program Reimbursement to Providers  For Prescription Drugs Dispensed to Program Beneficiaries

9.    Medicare and Medicaid, the two largest health care programs funded wholly or partly by the United States, include certain pharmaceutical benefits for covered persons, as do certain other federally funded health care programs such as TRICARE (including "CHAMPUS," the Civilian Health and Medical Program of the Uniformed Services), the Civilian Health and Medical Program of the Veterans Administration, the Federal Employees Health Benefits Program, and the Indian Health Service.  These programs do not buy drugs; instead, they reimburse providers who dispense covered drugs to program beneficiaries.

10.    By law, federal and state health care programs that reimburse providers such as

Defendants for prescriptions dispensed to program beneficiaries pay an amount for each covered drug that is limited to the *lesser of* (1) the pharmacy provider's usual and customary ("U&C") price; or (2) one or more alternative price types ("APT" in the singular, and "APTs" in the plural, form).

11.     The APTs are known by designations such as "Estimated Acquisition Cost," "Negotiated Price," "Contract Price," and "Ingredient Cost," depending on the specific government program.  Specific maximum prices known as "Federal Upper Limit" (FUL) prices are set for some drugs by federal programs. Similarly, specific maximums known as "Maximum Allowable Cost" (MAC) prices are set by state Medicaid agencies for some drugs.   Not all drugs are subject to a FUL or a MAC.

### B.     The Emergence of Deeply Discounted Prices for Some Generic Drugs

12.     Historically, retail pharmacies' U&C prices ordinarily have substantially exceeded APTs.  Consequently, reimbursement rates paid by government programs for most drugs have usually been determined by APTs and not by U&C prices.

13.     With the emergence of Medicare Part D in early 2006, however, Defendants instituted a discount generic drug program which offered to cash customers certain 90-day pharmaceuticals to customers for $10, $15, or $25, and a 30-day supply of select acute drugs for $5.

14.     Within months, one of Defendants' national competitors, Wal-Mart, launched a similar discount generic program which offered certain 30-day pharmaceuticals for $4.

15.     In the latter part of 2006, to preserve their pharmacy customer base and maximize revenue, Defendants manipulated and extended their existing "Price Matching" program to contend with Wal-Mart's 30-day program and similar, existing and anticipated programs of other competitors.

16.     By early 2007, Defendants, along with a significant number of national retail pharmacies in the United States, had in place some variation of a generic drug discount program

offered to cash customers.  As such, U&C prices became substantially lower than APTs and, consequently, there was a dramatic shift in third-party pharmacy reimbursement.

### C. Defendants' Phantom Carrier Schemes: Matching Competitors' Lower U&C Prices Without Giving Up Higher APT Reimbursements

17.     According to its 2010 Annual 10k Report, Defendants operate stores in 49 states[1], Guam, Puerto Rico, and the U.S. Virgin Islands, and fills prescriptions for Medicare, Medicaid and other government program beneficiaries as a substantial part of the business transacted by their pharmacies in no less than 48 of the States, Guam, Puerto Rico, and Trinidad and Tobago.

18.     Prior to May of 2006, Defendants simply did not disclose their cash prices to government programs as their U&C prices, as required by law.  Instead, it reported fictitious U&C prices based on Average Wholesale Price (AWP) less 5%,[2] or on the prevailing MAC or FUL price when one existed, in order to continue to capture the maximum allowable government program reimbursement for specific drugs.

19.     In May 2006, Defendants invented a fictitious insurance carrier, which it called "RMP," to better conceal from government programs their growing volume of low-dollar cash (U&C) transactions. Under that scheme the nominal cash prices patients actually paid are reflected in Defendants' records as "co-payments," and RMP is falsely depicted as a primary insurance carrier to which claims based on the lesser of a fictitious U&C or APT are submitted.  The illusory RMP "carrier" has been used principally to conceal Defendants' actual U&C prices for 90-day supplies of prescription drugs.

20.     In October 2008, as the volume of their competition-driven  30-day prescription transactions increased, Defendants devised yet another mythical primary insurance carrier, which it

---

[1] Alaska is the only State that Defendant Sears reported as having no Kmart stores.
[2] AWP is the acronym for "Average Wholesale Price," an arbitrary "price" reported by drug manufacturers to national drug pricing compendia that does not reflect actual market prices and that typically is substantially higher than actual market prices.

4

calls CIM, to better conceal from government programs its nominal cash prices for those prescriptions.  Defendants' pharmacy software system, PDX, records the customer's cash purchase price as  the customer's co-payment, compares Defendants' reported but fictional U&C price to the applicable APT, and submits a claim to the government program for the "lesser" APT.

     **D.**     **Monetary Incentives to Purchase Prescription Drugs from Defendants: The Kickback Schemes**

     21.     From at least 2006 and continuing to the present, Defendants have distributed to new and transferring pharmacy customers monetary inducements in the form of gift cards, discount coupons, and other, similar remuneration schemes by various names, as promotional incentives to purchase prescription drugs from Defendants.  Although providing such remuneration to induce business reimbursable under federal and state health care programs is prohibited by the federal health care anti-kickback statute, Defendants consciously disregarded that prohibition and took affirmative measures to ensure that federal health care program beneficiaries received the same inducements as the general public, even giving its pharmacy staff instructions for avoiding its official admonitions about obeying the law and suggesting instead that Defendants' pharmacists should not "bother yourselves with being the coupon police."

**V.**     **JURISDICTION AND VENUE**

     22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730 (b).  This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).  This court also has supplemental jurisdiction over Plaintiffs' state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.  Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because the Defendants can be found in, and transact business in, this Judicial District.

## VI.      VOLUNTARY DISCLOSURE

23.      As a pharmacist for Defendants, Relator has direct, personal, and independent knowledge of the facts underlying the allegations of this Complaint.

24.      Relator has verified through personal experience as a pharmacist for Defendants in several states, and through personal communications with other pharmacy employees of the Defendants through several States that the alleged fraudulent conduct has occurred, and continues to occur, in Florida, Georgia, Indiana, Kentucky, Texas, and West Virginia.   Further, Defendants utilize a standard "PDX" computer platform across all their pharmacies nationwide to process pharmacy claims.  Because every one of Defendants' pharmacies utilizes the same PDX platform to process claims, Defendants' fraudulent conduct is occurring in all of Defendants pharmacies.

25.      Relator believes there has been no public disclosure of the allegations and transactions contained herein; but should the question arise, and should the court determine otherwise, the Relator is an original source of the allegations in this Complaint, as defined in 31 U.S.C. §3730(e)(4)(B).

## VII.     DEFENDANTS' FRAUDULENT CONDUCT

### A.      Overview

26.      Since approximately May 2006, Defendants have knowingly engaged in a pattern of fraudulent conduct to obtain excessive, as well as prohibited, illegal payments from federal and state government healthcare programs ("GHP" in the singular form and "GHPs" in the plural form) for generic prescription drugs furnished by Defendants to GHP beneficiaries.

27.      Defendants' claims for payment to GHPs for generic drugs furnished to GHP beneficiaries were false for the following reasons:

  a.  Fully aware that GHP prescription drug reimbursement rules generally provide for the payment of the lesser of a provider's usual and customary ("U&C") price and one or more APTs, Defendants

knowingly concealed their true U&C prices which were materially lower than APTs and reported false, inflated U&C prices to GHPs which were higher than APTs, in order to obtain excessive payments under reimbursement rules.

b. Defendants, in violation of federal and state anti-kickback laws, knowingly offered and paid illegal remuneration to GHP beneficiaries to induce their purchase from Defendants of drugs which were paid for in whole or in part by GHPs.

28. GHPs paid Defendants' false claims for generic prescription drugs furnished to GHP beneficiaries based on the false set of facts, i.e., that Defendants' U&C prices were higher than other applicable APTs and that the underlying drug purchases by customers were not induced by Defendants' offer or payment of illegal remuneration, and GHPs would not have paid such claims it they had known the true state of facts.

29. As a result of Defendants' fraudulent conduct, GHPs unwittingly paid to Defendants and Defendants fraudulently 1) collected from GHPs excessive reimbursements based on APTs higher than Defendants' true, lower U&C prices, and 2) paid unlawful reimbursements prohibited by law to GHP beneficiaries to induce them to make purchases, which were tainted by illegal kick- backs and for which Defendants were not entitled to receive any payment.

30. Defendants' fraudulent scheme has caused, and continues to mislead, GHPs to pay Defendants significantly higher reimbursement amounts than Defendants were, and are, entitled to receive under federal and state laws and regulations for prescriptions filled for GHP beneficiaries.

31. Defendants have submitted millions of false claims for prescriptions Defendants filled for GPH beneficiaries, based on the number of Defendants' nationwide chain of pharmacies, the number of generic drugs involved, the number of GHP prescription drug transactions at each pharmacy, and the covered time period which is ongoing.

32.     GHPs that have been damaged by Defendants' fraudulent conduct include, but are not limited to, Medicare Part D, Medicaid, TRICARE (including "CHAMPUS," the Civilian Health and Medical Program of the Uniformed Services), the Civilian Health and Medical Program of the Veterans Administration, the Federal Employees Health Benefits Program, and the Indian Health Service.

**B.     Scope of Fraud**

33.     Through personal experience as a pharmacist for Defendants in several states, and through personal communications with other pharmacy employees of the Defendants, Relator has verified that Defendants' disregard of their U&C prices for certain generic pharmaceuticals when seeking reimbursements from government health care programs has occurred, and continues to occur, in Florida, Georgia, Indiana, Kentucky, Texas, and West Virginia.  By way of example,

> a.  A pharmacist intern at Defendants' Charleston, West Virginia and Louisville, Kentucky locations confirmed in June 2009 that Defendants were submitting reimbursement claims to federal and state government health care programs for amounts greater than the prices paid by their cash customers for the medications dispensed and were being reimbursed by those programs in the excessive amounts claimed.

> b.  A pharmacist at Defendants' Atlanta, Georgia location confirmed in June 2009 that Defendants had engaged, and continued to engage in the pattern and practice of submitting to federal and state government health care programs claims for higher reimbursement amounts than the corresponding amounts paid by Defendants' cash customers for pharmaceuticals listed on Defendants' discounted generic formularies.

34.     Additionally, due to the nature of Defendants' PDX pharmacy operating system, Defendants' illusory third-party carriers are universally employed to conceal cash transactions with customers in Defendants' pharmacies.  Because every one of Defendants' pharmacies utilizes the PDX pharmacy operating system, Defendants' fraudulent conduct is occurring nationwide.

C.   **Defendants' False Claims for Excessive GHP Generic Prescription Drug Payments**

1.   **Overview of GHP Prescription Drug Reimbursement Methodologies**

35.     GHP prescription drug reimbursement methodologies generally provide for payment of the lower of - -

    a.   The pharmacy provider's usual and customary ("U&C") price; or
    b.   One or more APTs.

36.     GHPs, with the exception of certain State Medicaid programs, generally define the "U&C" price, in substance, as the price that a pharmacy charges a customer who does not have, or elects not to use, any form of prescription drug insurance coverage.  Customers who do not have or use insurance coverage to purchase prescription drugs are commonly referred to as "cash customers," and the related drug sales and purchases are commonly known as "cash transactions."

37.     While several State Medicaid programs define U&C price in the same, substantive manner as the pharmacy's price to cash customers, other State Medicaid programs define U&C price based on the pharmacy's prices to both cash customers and customers with private insurance coverage.

38.     Pharmacy providers have a legal duty as a condition of payment, when submitting claims for prescription drugs to GHP's that require the reporting of U&C prices to either i) report the pharmacy's prices to cash customers as its U&C prices, or ii) determine and report the pharmacy's U&C prices based on its prices to both cash and privately insured customers, depending on the particular GHP's U&C price definition.

39.     Examples of APTs included in GHP reimbursement methodologies which are used as the basis for reimbursement when an APT is lower than the pharmacy reported U&C price are as follows:

9

a. Negotiated Price, plus Dispensing Fee.  Negotiated prices are the costs for drugs agreed upon through direct negotiation between GHPs, specifically Medicare Part D plan sponsors, or an intermediary organization such as a pharmacy benefit manager (third party administrators that process and pay claims for drug plans), and the drug manufacturer;

b. Estimated Acquisition Cost ("EAC"), plus Dispensing Fee.  EAC is a State Medicaid agency's estimate of the price generally and currently paid by providers, e.g., pharmacies.  Although there are almost no restrictions on the methods used by States to determine EAC, States predominantly calculate (historically and currently) EAC as the Average Wholesale Price (AWP) less a fixed percentage.  EACs are also sometimes defined as Wholesale Acquisition Cost plus a percentage, Direct Price plus a percentage, Average Sales Price plus a percentage, or Actual Acquisition Cost.  In some instances State reimbursement methodologies calculate EAC by more than one method and use the lowest amount to compare to U&C and other APTs;

c. Maximum Allowable Cost ("MAC"), plus Dispensing Fee.  Originally, MACs that limited drug reimbursement under Federal programs, including Medicaid, were determined by a Federal Pharmaceutical Reimbursement Board, assisted by a Pharmaceutical Reimbursement Advisory Committee, pursuant to the procedures outlined in the regulations.  The Federal MAC later transitioned into the Federal Upper Limit described below.  State Medicaid agencies also had and have the discretion to establish State MACs as APTs.  A State MAC, in essence, is another type of EAC; or,

d. Federal Upper Limit ("FUL"), plus Dispensing Fee.  Federal Medicaid regulations establish an upper limit on the amount State Medicaid programs may pay for certain multiple source drugs, that is, brand drugs with available generic drugs.  These limits are intended to assure the government acts as a prudent buyer of drugs and achieves savings by taking advantage of current market prices.  Beginning in 2007, payments for multi-source drugs subject to a FUL could not exceed, in the aggregate, payment levels determined by applying for each drug a reasonable dispensing fee plus 250% of the Average Manufacturer Price for the least costly therapeutic equivalent.  Prior to 2007, FUL aggregate payment levels were determined by applying for each drug a reasonable dispensing fee plus 150% of the published price of the least costly therapeutic equivalent.

40.     As indicated, APTs consist of two components.  The first component, the negotiated price, EAC, MAC, or FUL, is intended to reimburse the ingredient cost of a drug.

The second component, the dispensing fee, is intended to reimburse the pharmacy for pharmacy operation costs, including, but not limited to, costs associated with a pharmacist's time in checking the computer for information about an individual's coverage, performing drug utilization review and preferred drug list review activities, measuring or mixing the covered outpatient drug, filling the container, counseling the beneficiary, physically providing the completed prescription to the Medicaid beneficiary, delivery, special packaging, and overhead associated with maintaining the facility and equipment necessary to operate the pharmacy.

41.     With respect to GHPs with reimbursement methodologies that provide for the payment of the lesser of U&C price or an APT, the GHP compares the U&C price with no dispensing fee against the APTs, each APT consisting of both the ingredient cost, plus a dispensing fee.

### 2.     Specific GHP Prescription Drug Reimbursement Methodologies

#### a.     Medicare Part D Voluntary Prescription Drug Benefit Program

42.     The voluntary Medicare prescription drug benefit program commonly known as Medicare Part D ("Part D") was enacted into law on December 8, 2003 in section 101 Title 1 of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA") (Pub. L. 108-173) and became available to beneficiaries beginning on January 1, 2006.

43.     Generally, coverage for the Part D drug benefit is provided through private prescription drug plans ("PDP" in the singular, and "PDPs" in the plural, form) acting as agents of the United States.

44.     The Part D drug reimbursement methodology requires PDPs to ensure that Part D enrolees are not charged more than the lower of –

a.   The price based on negotiated prices, including or plus a dispensing fee; or

11

      b.   The usual and customary price.

42 U.S.C. §1395w-141(h)(8).

    45.    As mentioned above, negotiated prices are the plan discount prices a PDP

negotiates with manufacturers for the benefit of its enrollees.

    46.    With respect to discount generic drug programs like Defendants' which offer

every-day reduced prices to their customers throughout the year on certain drugs, the reduced

price is the pharmacy's U&C price, and the price on which the Part D sponsor must reimburse

the pharmacy if it is lower than the negotiated price with a dispensing fee.

    47.    This principle was clarified in an October 11, 2006 memorandum to all Part D

sponsors from the CMS Director of the Medicare Drug Benefit Group on the subject "Lower

Cash Price Policy" (October 2006 CMS Memo).   The memo directly responded to a question

concerning whether during a Part D deductible or coverage gap phase an individual's payment of

a price lower than the Part D negotiated price would count toward the enrollee's true out-of-

pocket ("TrOOP")[3] balance.   In answering the question, the memo noted the distinction between

cases where a pharmacy like Defendants offer a lower price to their customers throughout the

year and the one-time or limited offer "lower cash price" situation that was the main subject of

the guidance. The memo confirmed that every-day, reduced prices are considered a pharmacy's

U&C prices under the Part D benefit design.   In this respect the memo stated as follows:

> We note that in cases where a pharmacy offers a lower price to its customers
> throughout a benefit year, this would not constitute a 'lower cash price' situation
> that is the subject of this guidance.   For example, Wal-Mart recently introduced a
> program offering a reduced price for certain generics to its customers.   The low
> Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual

---

[3] Standard Part D beneficiaries are required to pay a deductible and then cover 25% of their drug costs until they enter a range of out-of-pocket spending called the "doughnut hole."  While in the doughnut hole, beneficiaries are responsible for 100% of their drug costs until their TrOOP reaches a specified amount called the "catastrophic limit," after which time beneficiaries are responsible for 5% or less of their drug costs for the remainder of the year.

and customary' price, and is not considered a one-time 'lower cash' price.  Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price.  To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug.  Suppose Wal-Mart offers the same generic drug throughout the benefit for $4.  The Plan considers the $4 to take the place of the $10 negotiated price.  The $4 is not considered a lower cash price, because it is not a one-time special price.  The Plan will adjudicate Walmart's claim for $4 and the beneficiary will pay only a $1copay, rather than a $2.50 copay.  This means that both the Plan and the beneficiary are benefitting from the Wal-mart 'usual and customary' price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design.  Therefore, the beneficiary can access this discount at any  point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send documentation to the plan to have the lower cash price count toward the TrOOP.

October 2006 CMS Memo n.1.

48.     The foregoing quotation from the October 2006 CMS memo is re-stated verbatim in the Medicare Prescription Drug Benefit Manual ("MPDB Manual"), Chapter 14 – Coordination of Benefits, Section 50 – Part D Sponsor Requirements, Subsection 50.4.2 – Beneficiary Cash Purchases (CMS Pub. No. 100-18).

### b.     Medicaid

49.     Medicaid is a joint and voluntary program between the federal government and the states, whereby lower-income, disabled and elderly individuals are offered basic healthcare coverage.

50.     The Federal government pays a share of the medical assistance expenditures under each State's Medicaid program. That share, known as the Federal Medical Assistance Percentage ("FMAP") or the Federal Financial Participation ("FFP"), is determined annually by a formula that compares each state's average per capita income with the national per capita income average.  The federal share varies inversely with each state's per capita income; the greater a state's per capita income, the smaller the federal share of its Medicaid costs.  By law, the FMAP cannot be lower than 50 percent or higher than 83 percent.  Attached hereto as Exhibit A is a list

of Federal Medical Assistance Percentages and Enhanced Federal Medical Assistance

Percentages for all states, for fiscal year 2009.

51.     Since at least 1976, the Medicaid rules divided reimbursable drugs into two

categories: i) multiple source drugs subject to a FUL; and ii) other drugs.  Multiple source drugs

have been subjected to a FUL when there are multiple equivalent drugs and suppliers.  Other

drugs include single-source drugs, certified brand drugs (physician certification brand is

medically necessary for particular recipient), and drugs other than multiple source drugs for

which a FUL has been established.

52.     The FUL for multi-source drugs has been determined for the last 20-plus years as

follows:

1987-2006

State agency payments could not exceed, in the aggregate, payment levels
determined by applying for each drug a reasonable dispensing fee plus 150% of
the published price of the least costly therapeutic equivalent.

2007-Present

State agency payments could not exceed, in the aggregate, payment levels
determined by applying for each drug a reasonable dispensing fee plus 250% of
the Average Manufacturer Price for the least costly therapeutic equivalent.

53.     During the same time period, Medicaid rules have provided that State agency

payments for other drugs must not exceed in the aggregate, payment levels the agency has

determined by applying the lower of the following costs and charges:

a.     EAC plus a reasonable fee established by the agency; or

b.     The provider's usual and customary charges to the general public.

54.     The FUL is just that, an upper limit, and the State agency will pay the EAC or

U&C price of a multi-source drug if it is lower than the FUL.  Accordingly, the Medicaid

reimbursement methodology for all covered drugs can be summarized to provide for the payment of the lesser of the following costs, charges, or limits:

      a.      The provider's usual and customary charge to the general public;

      b.      EAC plus a reasonable dispensing fee established by the State agency;

      c.      State MAC, if any, plus a reasonable dispensing fee; or

      d.      FUL.

55.      As discussed above, several State Medicaid programs define U&C price as the pharmacy's prices to cash customers, and others define U&C price based on the pharmacy's prices to both cash and privately insured customers.  In either case, pharmacy providers have a legal duty as a condition of payment to accurately determine and report their true U&C prices when submitting claims to GHPs.

### c.    TRICARE

56.      TRICARE is the managed health care program established by the Department of Defense ("DoD") for active duty service members, active duty family members, retired service members and families, and certain other eligible beneficiaries (e.g., Medal of Honor recipients and their families) and is a major component of the Military Health System.  It includes the competitive selection of contractors under the prior existing Civilian Health and Medical program of the Uniformed Services ("CHAMPUS") fee for service program.   TRICARE is available worldwide and is managed in four separate regions, three in the United States (North, South and West) and one overseas region which is divided into 3 main areas (Eurasia – Africa, Latin America and Canada, and Pacific Areas).  The Overseas region and its areas operate under different procedures than TRICARE in the U.S.

57.     To enable the DoD to concurrently provide military members and their families access to comprehensive health care services and maintain the capability to support military operations, TRICARE services are furnished through a combination of the military's direct care system of hospitals and clinics and a system of TRICARE authorized network and non-network civilian health care providers and suppliers.

58.     TRICARE selects contractors to establish networks of health care providers (contractor networks) to supplement the care available at Military Treatment Facilities ("MTF" in the singular, and "MTFs" in the plural, form) and to perform a variety of administrative and related support services, including claims processing.

59.     Non-active duty individuals, commonly referred to as "TRICARE eligibles," [4] also may use TRICARE authorized, non-network providers under CHAMPUS.

60.     TRICARE offers comprehensive health coverage with several plan options, a pharmacy benefit, dental options and other special programs.  The scope of covered benefits, providers of services, and beneficiary out-of-pocket costs depend on the plan selected, and plan eligibility depends on beneficiary status and, in certain instances, residency, e.g., individuals in designated remote locations in the U.S., in overseas areas near military treatment facilities, or in remote overseas areas.  Beneficiary out-of-pocket costs are further based on beneficiary status and the provider of services.  Active duty service members do not pay any costs, and costs are lower for active-duty family members relative to retired service members and their families.  Generally there is no charge for services provided by MTFs, and costs are lower for services performed by network providers compared to non-network providers.  Active duty service

---

[4] E.g., the spouse and children of active duty personnel, retirees and their spouses and children, and survivors, include former spouses as defined by statute.

16

members receive first priority for treatment at MTFs and the assignment of primary care managers, if availability is an issue.

61.     Included in the TRICARE benefit package is a retail pharmacy and a mail service pharmacy program.  The TRICARE pharmacy benefit is the same regardless of beneficiary category or which health plan option is selected.

62.     Prior to August 1, 2002 and continuing to the present, TRICARE contractors have been authorized to establish alternative reimbursement systems (except capitation payments), which may include usual and customary fees, when approved by TRICARE Management Activity and included in the network provider agreement.  TRICARE Reimbursement Manual 6010.55-M, August 1, 2002("TRM 2002"), Chapter 1, Section 1, Network Provider Reimbursement, II.B.; TRICARE Reimbursement Manual 6010.58-M, February 1, 2008("TRM 2008"), Chapter 1, Section 1, Network Provider Reimbursement, ¶2.2.

63.     Beginning February 1, 2008, subject to approval of an alternative network reimbursement methodology, TRICARE mandated the reimbursement of prescription drugs based on the lesser of –

      a.     The usual and customary price; or

      b.     The Maximum Allowable Cost ("MAC")[5]; or

      c.     TRICARE Pharmacy contractor's contracted rate for ingredient cost.

      TRM 2008 Chapter 1, Section 15, Legend Drugs and Insulin, ¶¶1.0 and 3.2.

64.     Since June 1, 2004 to the present, Pharmacy Benefit Manager ("PBM")[6] Express Scripts has operated the TriCare Retail Pharmacy contract for all TRICARE beneficiaries located

---

[5] MACs are developed by TRICARE on a nationwide, non-specialty basis and are set at the 80th percentile of charges made for a given benefit during the base period.

[6] A PBM is a third party administrator of prescription drug programs for Plan Sponsors.  Plan Sponsor groups include managed-care organizations, insurance carriers, employers, and union-sponsored benefit plans.  PBMs are primarily responsible for processing and paying prescription drug claims. Other PBM

in the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Guam, except

for beneficiaries enrolled in the Uniformed Services Family Health Plan.

65.    The Express Scripts Pharmacy Network Manual 12/2005 Revision 5 ("E-S

Manual") claims adjudication guidelines, general claims submission policies, require, in part, as

follows:

    a.    All claims must be submitted online in current NCPDP (National
          Council for Prescription Drug Programs) HIPAA-approved format,
          including medications when the Pharmacy's Usual and Customary
          retail price is less than the Copay.

    b.    All claims submitted must include the Pharmacy's Usual and
          Customary retail price, including all discounts on applicable date
          of fill.

E-S Manual § 2.1.

66.    Pursuant to the E-S Manual, Express Scripts' TRICARE reimbursement

methodology is based on the lower of:

    a.    Average Wholesale Price ("AWP") less the contracted discount
          baseline price (as calculated by First DataBank[7]) less the
          contracted discount for the specific network;

    b.    MAC or submitted cost plus the contracted dispensing fee for that
          network; or,

    c.    U&C.

---

services include negotiation of discount prices with retail pharmacies, mail pharmacy services, benefit
design consultation, drug utilization review, formulary management, disease management, and clinical
and utilization management programs.

[7] First Data Bank ("FDB") provides integrated drug database products and is one of several commercial
drug pricing compendia which compile and publish the AWP and WAC prices suggested by drug
manufacturers for their products.  For the past four decades, AWP has served as the standard pricing
benchmark used to calculate reimbursement for drugs by most payers, including State Medicaid
programs.  Recent litigation by State Medicaid Programs and others against drug manufacturers has
exposed that published AWP and WAC prices do not remotely reflect actual transaction prices in most
cases, and frequently are 5x, 10x, and 15x, or more, higher than actual transaction prices.  As a result of
the settlement of a related lawsuit alleging that FDB conspired with drug wholesaler McKesson Corp. to
fraudulently inflate AWP, causing consumers and third party payers to over pay  for drugs, FDB and
publisher Medi-Span pledged to cease publishing AWP by September 26, 2011.

E-S Manual § 2.3.

67.     The E-S Manual defines "Usual and Customary Retail Price (U&C)" as "The usual and customary retail price of a Covered Medication in a <u>cash transaction</u> at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions offered on such date.  E-S Manual Express Scripts Glossary. (Emphasis added).

### d.     FEHBP

68.     The Federal Employees Health Benefits Program ("FEHBP") offers comprehensive group health insurance to federal employees, retirees and their eligible family members through a wide variety of qualified carriers and plans approved by the U.S. Office of Personnel Management ("OPM").  Beneficiaries may choose among fee-for-service (FFS) plans, Preferred Provider Organization (PPO) plans, plans offering a Point-of-Service product, health maintenance organizations (HMOs), consumer-driven health plans (CDHPs) and high deductible health plans (HDHPs).  There are separate and different provider networks for each plan.

69.     Premiums vary by plan and are shared by the federal employee and the Federal agency employer. The government pays the lesser of 72% of the average total premium of all plans weighted by the number of enrollees in each, or 75% of the premium for the specific plan selected by the employee.  An employee's share of the premium is automatically paid through a payroll deduction using pretax dollars.  Government and enrollee contributions are paid into the U.S. Treasury Employees Health Benefits Fund which is administered by the OPM and available for payment to plans and to pay program administrative expenses.

70.    Since at least 2006, FEHBP plans have been PBM Caremark's largest customers, and, based on Relator's experience, the majority of Defendants' FEHBP claims are processed by Caremark.

71.    The 2007 Caremark Provider Manual ("2007 CM Manual") and 2009 CVS Caremark Provider Manual ("2009 CVS/CM Manual") contain identical FEHBP prescription drug reimbursement methodologies and related definitions, including the same U&C definition.

72.    Pursuant to the 2007 CM Manual and 2009 CVS/CM Manual, FEHBP prescription drugs processed by Caremark are reimbursed at the lower of:

a.    Price Type[8] plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount);

b.    MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount;

c.    Ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; or

d.    Provider's U&C price less the applicable Patient Pay Amount.

73.    The 2007 CM Manual and 2009 CVS/CM Manual define "Usual and Customary Price or U&C" as "the lowest price Provider would charge a particular customer if such customer were paying cash for an identical prescription on that particular day at that particular location.  This price must include any applicable discounts offered to attract customers." (emphasis added).

74.    Other terms identically defined in the 2007 CM Manual and 2009 CVS/CM Manual and referenced in the Caremark FEHBP reimbursement methodology are as follows:

---

[8] See paragraph 74.

a.      "Price Type" means a current price of a given drug as defined by a nationally recognized reference that Caremark may reasonably select from time to time, which may include, but is not limited to: AWP (Average Wholesale Price), WAC (Wholesale Acquisition Cost), AMP (Average Manufacturer Price, ASP (Average Sales Price) or DP (Direct Price).

b.      "Patient Pay Amount" means the amount an Eligible Person must pay to Provider at the time a Covered Item is dispensed as indicated by the claims system, which may include but is not limited to copayments, coinsurance, deductibles, transaction fees, access fees, and/or taxes.

c.      "AWP or Average Wholesale Price" means the current wholesale cost of a given drug as defined in the latest edition of the First DataBank Blue Book, Medi-Span (with supplements), MICROMEDEX, or any other similar nationally recognized reference which Caremark may reasonably select from time to time.

d.      "MAC or Maximum Allowable Cost" means a unit price that has been established as the reimbursement amount to Provider for certain multiple-source drugs without regard to the specific manufacturer whose drug is dispensed.

75.    The 2007 CM Manual and 2009 CVS/CM Manual also impose virtually identical, additional U&C validation requirements on pharmacies which obligate providers to submit accurate U&C pricing for all Caremark claims, including prices which are part of a set price program offered by the provider.  In this regard the 2007 CM Manual states as follows:

U&C Validation

Provider is required to submit accurate Usual and Customary (U&C) pricing for all Caremark claims, including prices which are part of a set price program offered by Provider.  Provider must provide, upon request, a record of the dispensing of a prescription (identical to the prescription being audited) that was dispensed to a cash paying customer on the same date if such dispensing occurred. Provider can redact confidential patient health information from the record in accordance with applicable Law, but the record must contain the patient charge amount.

Caremark has the right to review and audit documentation as detailed in this section to validate U&C accuracy.  Provider is required to collect from the eligible Person the lesser of the U&C or Patient Pay Amount.  Provider must

submit a claim to Caremark regardless of collected amount from the Eligible Person.[9]

76.    In the context of discount generic prescription drug programs, the 2007 CM Manual and 2009 CVS/CM Manual also contain identical requirements which obligate a pharmacy to inform customers of its U&C price when the U&C price is less than the applicable patient co-pay.   In this regard the 2007 CM Manual states as follows:

> Provider shall disclose to each Eligible Person Provider's Usual and Customary Price if such Usual and Customary Price is less than the applicable Patient Pay Amount.  Provider shall allow the Eligible Person to pay either the Usual and Customary Price or the Patient Pay Amount, whichever is lower, unless a Plan otherwise requires.  Notwithstanding the foregoing, Provider shall submit a claim to Caremark, even if the Eligible Person elects to pay the Usual and Customary Price.

77.    As part of a 2008 CVS Caremark Network Update, pharmacies were again reminded that they were required to submit accurate U&C pricing for all Caremark claims, particularly as generic drug programs featuring set prices became more popular and since providers were required to allow plan participants to pay either the U&C price or the patient pay amount, whichever was lower, except in one, rarely occurring circumstance.  The update states in relevant part as follows:

**Usual & Customary (U&C) Charges**

As generic drug programs featuring set prices become more popular, please remember you are required to submit accurate Usual and Customary pricing for all Caremark claims.   The Caremark Provider Manual defines Usual and Customary as:

**"Usual and Customary Price or U & C"** means the lowest price Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day at that particular location. This price must include any applicable discounts offered to attract customers.

---

[9] Except for the replacement in the first sentence of the phrase "Usual and Customary (U&C) pricing" with the synonymous phrase "U&C prices", the 2007 CM Manual and 2009 CVS/CM Manual U&C validation provisions are word for word.

As a reminder, Provider must submit all claims for Pharmacy Services related to Covered Items for Eligible Persons electronically through the applicable claims system.

The information transmitted must be accurate and complete.  Caremark audits for appropriate U&C pricing during several audit processes, including on-site visits. In addition, Caremark's proprietary auditing program includes careful scrutiny of prescription reversals, changes in plan participant prescription dispensing and other criteria that may indicate pharmacy provider billing issues.  Please inform pharmacies and appropriate staff regarding this requirement to avoid audit discrepancies.  Provider is required to allow plan participants to pay either  the U&C price or the patient pay amount, whichever is lower unless a Plan otherwise requires.  Pharmacy Provider must still submit a claim to Caremark even if the claim pays at U&C.

### 3.    Defendants' Non-formulary Based, Cash Override, 30-Day Supply Prescription Fill Scheme

78.    Beginning in 2006 with the advent of competitor discount generic drug

formularies and prices, Defendants reduced their every-day, U&C prices to cash customers to

meet or beat the discount generic drug prices charged by its competitors.

79.    At the same time, on claims for payment Defendants submitted to GHPs for the

same generic drugs it sold to cash customers at every-day low prices, Defendants defrauded the

GHPs in one or more the following respects:

     a.    Defendants knowingly neglected to accurately report the actual, every-day U&C prices they charged cash customers for the same generic drugs, and in instances where the computation of actual U&C prices under applicable GHP rules (e.g., some State Medicaid programs) took into account sales prices in addition to cash customer prices, Defendants knowingly made no effort to calculate their actual U&C prices; and

     b.    Defendants knowing reported materially, and oftentimes grossly, inflated U&C prices for the same generic drugs they sold to cash customers at deeply reduced prices.

80.    Defendants' knowing, fraudulent conduct misled and caused GHPs to pay

millions of Defendants' false claims based on APTs materially higher than Defendants' actual

U&C prices, in contravention of government mandated reimbursement methodologies which

dictate payment of the lower of U&C prices or APTs, and to the damage of financially-strained government programs.  This allowed Defendants to maintain revenue levels from GHPs and simultaneously compete for customer base.  Defendants reaped egregiously excessive profits from GHPs and/or subsidized reduced cash customer prices at the expense of GHPs to drive store traffic and profitability.

### a.    Fall of 2006 through September 2008

81.    In the absence of competitive pressures, pharmacies have an economic incentive to establish U&C prices higher than any health insurance APTs, since GHP and private insurer reimbursement methodologies typically pay the lower of U&C prices or APTs.  U&C prices below the highest APTs result in a pharmacy's loss of available potential revenue.  For this reason, the every-day, U&C prices pharmacies historically have charged uninsured cash customers have been substantially higher than the prices charged to insured customers.  This practice continues today for drugs that are not on a discount formulary or part of a reduced price program.

82.    In May 2006, Defendants instituted a discount generic drug program and formulary which offered a 90-day supply of covered medications to customers for $10, $15, or $25, and a 30-day supply of select acute drugs for $5.  This program is discussed in detail in Section VII, subsection A.4. below.

83.    Four months later, in September 2006, Wal-Mart launched a discount generic prescription drug program which offered a 30-day supply of covered generic drugs for $4.  The program was initially offered in the Tampa Bay, Florida market, but was expanded two months later in November 2006 to all 3,800 Wal-Mart and affiliated Sam's Club and Neighborhood Market pharmacies nationwide in 49 states. Wal-Mart's initial 30-day supply formulary consisted of approximately 300 drugs at commonly prescribed dosages.

84.     In the latter part of 2006, Defendants' existing "Price Matching" program, which was previously limited in nature, was manipulated and expanded to contend with the 30-day supply, formulary-based, discount generic drug program offered by Wal-Mart and similar, existing and anticipated programs of other competitors.

85.     Defendants intentionally avoided creating their own proprietary discount drug formulary and instead, through their Price Matching program, offered to "meet or beat" the discount prices of drugs on their competitors' formularies.  The objective behind this program design was to enable Defendants to use generic discount drug pricing to compete for customer base and store traffic, and at the same time deny that their discount prices were U&C prices.

86.     Defendants customarily sold the $4 drugs on their competitors' formularies to cash and certain insured customers for $4.00 or less, and frequently for as little as $3.89, with certain exceptions.  As discussed in detail below, the exceptions include Defendants' submission of false claims to GHPs based on their sale of the same drugs to GHP beneficiaries at materially higher prices.

87.     Whether Defendants sold the competitor's discount drug to a customer at the same, a lower, or a higher price depended on several factors, including whether the customer was a cash customer or a customer utilizing insurance coverage with a copay higher or lower than the discount drug program price.

88.     Insurance information generally was obtained from a customer by pharmacy staff on the customer's initial pharmacy visit.  If the customer had insurance, the pharmacy staff member entered the customer's primary and any secondary payer information in the third party payer section of Defendants' pharmacy transaction software system, and on subsequent visits, the customer's designated, default primary payer coverage automatically would be applied, unless manually changed or unless a claim was reversed after submission to the carrier.  If the

customer was uninsured, no payer information was entered into the system, and the initial and subsequent transactions were processed as cash transactions, unless the customer's uninsured status changed.  For both customers paying cash and those utilizing insurance, the prescription number assigned to an original fill extended to any refills.  When a refill was presented, the assigned prescription number automatically prompted the system to transact the sale with the prior payer source, unless changed.

89.    Copay information was generally obtained by pharmacy staff from the insurer or its benefits administrator, when the staff member submitted a claim for adjudication between the time the customer dropped off and picked up the prescription.

90.    When a cash customer presented a prescription at a Defendants pharmacy for a drug which was <u>not</u> on a competitor's discount formulary, Defendants charged the customer their list U&C price, which generally was higher than the APTs paid by health insurers and substantially more than the $4 price charged for drugs on the discount formularies.

91.    When a cash customer presented a prescription at a Defendants pharmacy for a drug on a competitor's discount formulary, Defendants pharmacy staff member manually typed the reduced price of $4.00 or less in the price override field of the Defendants PDX pharmacy transaction software system to bypass the inflated list U&C price and filled the prescription at the reduced price as a "cash transaction".  Since no insurance was involved, there was no claim to submit for adjudication to any Third Party Payer.

92.    Defendants' sales of drugs on their competitors' discount formularies to cash customers at their every-day, reduced "meet or beat" prices established their U&C prices for those drugs under the rules of many GHPs, including Medicare Part D, many State Medicaid Programs, TRICARE and FEHBP.

93.     When a GHP beneficiary presented a prescription at a Defendants pharmacy for a drug on a competitor's discount formulary, and the beneficiary's co-payment was <u>more</u> than the every day, reduced price to cash customers, the Defendants pharmacy staff member routinely manually overrode the listed, inflated U&C price and filled the prescription at the reduced price as a "cash transaction," once again establishing the reduced cash price as Defendants' actual U&C price for that drug. There were two common scenarios:

   a.    If the pharmacy staff member was familiar with, and knew the reduced price was more than the GHP copay for the drug, the staff member would (i) navigate to the third party section in the pharmacy transaction system, make the selection indicating there was no third party payer and the prescription should be filled as cash, and enter Yes, and (ii) manually type the reduced price of $4.00, or less, in the price override field and press the fill script key.

   b.    If the pharmacy staff member was not familiar with the GHP copay for the drug, the staff member would submit the claim to the GHP for payment, reverse the claim upon notification of a copay amount higher than the reduced price, and then follow steps (i) and (ii) in the foregoing subparagraph.

94.     In these instances, Defendants did not submit a claim to the beneficiary's GHP, even when a GHP required the submission of a claim for purposes of tracking the beneficiary's fulfillment of program milestones that may affect benefits.  It may be possible to identify some of the cash transactions described in this paragraph from Defendants' and/or GHP claim reversal records.

95.     In some instances where a GHP beneficiary's co-payment was more than Defendants' every-day cash price, Defendants nonetheless collected the higher copay and submitted a false claim for payment to the GHP with a false, inflated U&C price.  The falsely reported U&C price misled the GHP to pay Defendants an additional amount based on an APT that was lower than the falsely reported U&C, but materially higher than Defendants' true U&C

price.  These claims were false, whether paid or not, because it was unlawful under GHP

reimbursement rules, which provided for the payment of the lower of U&C prices or APTs, for

Defendants to collect copays and submit claims for any amount which were collectively greater

than their every day U&C prices to cash customers for the same drugs.  The GHP beneficiary

was also defrauded and damaged, since Defendants did not disclose or offer their true U&C price

to the beneficiary and the beneficiary paid a copay materially more than the U&C price.

96.     When a GHP beneficiary presented a prescription at a Defendants pharmacy for a

drug on a competitor's discount formulary, and the beneficiary's co-payment was <u>less</u> than the

every day, reduced price to cash customers, Defendants collected the copay and submitted to the

GHP false claims for payment which failed to report the true U&C price to cash customers for

the same drug and instead reported a fraudulent, higher inflated U&C price.  As a result of

Defendants' fraudulent conduct, GHPs were misled into paying Defendants based on APTs that

were lower than the falsely reported U&C prices and materially higher than the actual U&C

prices.  At most, GHPs should have paid the difference between the actual U&C price and the

copay.

97.     In situations described in the foregoing paragraph, whether or not the pharmacy

staff member knew the GHP copay was less than the every-day reduced price for the drug,

Defendants submitted a false claim for payment to the GHP designated as the default primary

payer.  If the staff member knew the copay was lower, a false claim was submitted for payment

to the GHP.  If the staff member did not know the copay was lower, the staff member submitted

a false claim to the GHP, and upon notification of a copay amount less than the actual U&C cash

price, completed the adjudication of the false claim through the GHP.

98.     Also, where a GHP beneficiary's out-of-pocket expense for a drug on a

competitor's discount formulary was <u>less</u> than the every day reduced price to cash customers, the

beneficiary had no financial concern whether the GHP was overcharged.  In any event, the

transaction was not transparent to the beneficiary, and the customer did not know the GHP was

overcharged.

### b.    Post-September 2008 Implementation of CIM

99.    In approximately October 2008, Defendants added "CIM" as a payer selection in

the third party payer section of the patient profile in their pharmacy transaction system.  In some

instances, pharmacy staff added the CIM payer selection, along with the entry of any third party

primary and secondary payers, when a patient profile was first created on a customer's initial use

of the pharmacy.  In other instances, the CIM payer selection was added the first time a customer

purchased drugs for cash.

100.    CIM is used by Defendants to identify, process, and track all 30-day supply

cash sales of discount and non-discount drugs.  The prior existing "no third party, fill as cash"

(paraphrased) option remained as a selection in the third party payer section, but if selected, the

pharmacy staff member would be redirected to process the claim with the CIM payer selection.

101.    With the implementation of CIM, Defendants were able to track cash sales on

a company-wide, district, or other selected store level.  Previously, they may have been able to

track cash sales only on a more or less store-by-store basis.

102.    Defendants' 30-day supply, price match program remained in effect and

unchanged after the introduction of CIM in all material respects.  Defendants continued to avoid

creating their own proprietary discount drug formulary, and pharmacy staff still had to manually

override the inflated, list U&C prices entered in their system to charge the $4 or less, match

discount price, when a customer presented a prescription for a drug on a competitor's discount

formulary, and the customer did not have or use insurance or had a GHP copay higher than the reduced price.

103.    As indicated, CIM is <u>not</u> an actual Third Party insurance carrier.  When CIM is selected as the payer and used to process a cash sale, the customer pays the entire amount of the cash price, no part of the cash price is paid by an actual third party payer, and no claim is submitted by Defendants to any third party payer that is not reversed (See paragraph 93, subsection b. above).

104.    Although CIM is not an actual insurance carrier, in a number of respects Defendants treats CIM as a third party insurance carrier within their pharmacy transaction software system.  As mentioned above, CIM is listed as an option in the third party payer section of the pharmacy software, along with any actual third party primary and secondary payers.  CIM gives the appearance of an acronym or abbreviation of an insurer or plan name, the same as with true third party payers and plans which are generally identified by acronyms or abbreviated descriptions of their names.  On cash transactions, (i) CIM is listed in the "Carrier" field of the "DUR [Drug Utilization Review] and Xmit/Reject Information" screen, and (ii) "Kmart Cash Plan" is listed in the field of the "Prescription Filling" screen where a third party payer is listed when Defendants submits a claim for payment under insurance coverage.  Defendants also have used a third party pharmacy management services provider to process their CIM cash transactions, along with their actual third party payer claims.

105.    An outside reviewer could easily be given the impression and misled to erroneously conclude CIM is just another health care insurer, based on Defendants' similar treatment of CIM and third party insurance carriers in their system.  This treatment masks the cash payment nature of the CIM transactions and makes them appear as third party payer transactions.  As an intended result, the CIM cash transactions would be overlooked as a basis

for establishing or calculating Defendants' true U&C prices.  This facilitates Defendants'
deliberate program design and objective to use generic discount drug pricing to compete for
customer base and store traffic, and at the same time conceal their true U&C prices and claim
and receive payments for sales of discount drugs to GHP beneficiaries at materially higher
prices, in knowing violation of GHP reimbursement rules.

106.    Defendants' prior procedures described above for transacting 30-day supply, sales
of drugs remained in effect and unchanged after the introduction of CIM in all material respects,
except for the recording and identification of all cash sales as CIM transactions.  Those
procedures are summarized as follows:

    a.    <u>Cash Sales</u>

        i.    When a cash customer presented a prescription for a drug which was <u>not</u> on a competitor's discount formulary, the sale was recorded in the computer system as a CIM transaction, and the customer was charged Defendants' list U&C price, which generally was higher than the APTs paid by health insurers and substantially more than the $4 price charged for drugs on the discount formularies. These sales make up an extremely small percentage and statistically insignificant number of cash sales.

        ii.    When a cash customer presented a prescription for a drug which was on a competitor's discount formulary, the sale was recorded in the computer system as a CIM transaction, and the Defendants pharmacy staff member manually typed the reduced price of $4.00 or less in the price override field to bypass the inflated list U&C price and fill the prescription at the reduced price.  Again, these cash sales at every-day low prices establish Defendants' true U&C prices for those drugs under the rules of many, if not most, GHPs.

        iii.    In many cases when a GHP beneficiary presented a prescription for a drug on a competitor's discount formulary, and the beneficiary's <u>co-payment was more than the every day reduced price to cash customers</u>, the sale was recorded in the computer system as a CIM transaction, and the Defendants pharmacy staff member manually overrode

the listed, inflated U&C price and filled the prescription at the reduced price, once again establishing the reduced cash price as Defendants' actual U&C price for that drug.

b.      GHP False Claims

i.      In some instances where a GHP beneficiary's <u>copay was more than Defendants' every-day cash price</u>, Defendants collected the higher copay and submitted a false claim for payment to the GHP with a false, inflated U&C price, which misled the GHP to pay Defendants an additional amount based on an APT lower than the falsely reported U&C, but higher than the true U&C price.   GHP beneficiaries are also cheated in this instance, along with the GHP, since they are not offered or advised of the true every-day cash price and pay a copay materially higher than the U&C price.

ii.      When a GHP beneficiary presented a prescription for a drug on a competitor's discount formulary, and the beneficiary's <u>co-payment was less than the every day, reduced price to cash customers</u>, Defendants collected the copay and submitted to the GHP false claims for payment which failed to report the true U&C price to cash customers for the same drug and instead reported a fraudulent, higher inflated U&C price.  As a result, GHPs were misled into paying Defendants based on APTs that were lower than the falsely reported U&C prices and materially higher than the actual U&C prices.

107.    Defendants have submitted false claims with fraudulently inflated U&C prices to GHPs for 300-plus generic drugs, which it sold to cash and certain other customers at their true every-day U&C price of $4 or less under their 30-day supply match price program.  Relator has knowledge of the much smaller subset of those drugs which account for the vast majority of sales and prospective damages.

108.    Relator is familiar with Defendants' pharmacy transaction software, its operation, and the various reports which are commonly, or can be, generated from the system.  Relator personally has the knowledge and capability to access and obtain information and generate reports from the system which, among other things, show for the same drug, on the same day or

during the same other relevant time period:  i) Defendants' every-day sale of 30-day supplies of generic drugs for $4 or less to cash customers and in some instances insured customers with copays higher than the discount price; ii) the false, inflated list U&C prices recorded in Defendants' pharmacy transaction software for such drugs; and iii) GHP payments based on reimbursement methodology APTs materially higher than the $4 or less U&C prices.

### c. Supporting Information/Internal E-mails and other communications

109.    The following K-mart e-mail communications confirm (i) that Defendants used the CIM payer designation to identify cash sales, and (ii) Defendants' knowledge that their cash prices determined their U&C prices.

a.    On April 27, 2010, Defendants issued a memorandum to pharmacy staff, attached hereto as Exhibit B, advising, "If the original claim cannot be processed on the insurance, then it must be re-entered as cash (CIM)."

b.    In an e-mail sent July 8, 2010 by Defendants' Corporate Pharmacy Team member and interim National Director of Pharmacy Operations, Timothy Weber, attached hereto as Exhibit C, Weber instructs pharmacy staff to refrain from opening "help tickets" (requests for clarification or instructions) for "Requests for changes in usual and customary (CIM)…"

c.    On September 21, 2010, Relator received an email from Defendants' Support Supervisor, Luisa Kopala, attached hereto as Exhibit D, instructing pharmacy staff to take the following procedures: "If the claim was processed as cash (CIM) on 9/20, please leave it as cash (CIM)," and "If the claim was put into Downtime on 9/20, please reverse and resubmit as cash (CIM)."

### d. Representative Examples of Defendants' False Claims for 30-Day Supply Prescription Fills and Supporting Drug Movement Reports

110.    The comparative examples in this subsection document and contrast Defendants' fraudulent and abusive GHP claim submission practices relative to the U&C prices Defendants charge to cash customers for 30-day supply prescription fills.

111.    In each comparative example, a GHP beneficiary and a cash customer had the same 30-day supply drug prescription filled at the same Defendants' pharmacy during the same relevant time period, and Defendants recorded the cash sale as a CIM transaction.

112.    The examples, individually and collectively, corroborate:  1) Defendants' true U&C prices to cash customers for various drugs; 2) Defendants' practice of identifying "CIM" as the primary payment "Carrier" on 30-day supply cash transactions for the purpose of disguising and misrepresenting cash transactions as covered health insurance claims; 3) Defendants' fraudulent submission on GHP claims of false, inflated U&C prices materially greater than the actual U&C prices charged to cash customers; and 4) GHP payment of amounts to Defendants materially greater than the balances remaining unpaid, after beneficiary co-payments, on the actual U&C prices charged to cash customers, as a consequence of the Defendants' reporting of false, inflated U&C prices to GHPs.

113.    With respect to the "Submitted Charge" listed in each example, it was Defendants' usual practice to set the charge on third party claims based on i) the AWP reported by the manufacturer to third party pricing services, plus ii) $5.  Virtually no one ever paid or pays the published AWP price, much less the higher Submitted Charge.

114.    Each example confirms Defendants' fraudulent report of an inflated list U&C price, even though the specific reported price is unknown.  As indicated above, GHP reimbursement rules mandate payment of the lower of U&C price or an APT, and a dispensing fee is not paid when a claim is reimbursed based on a U&C price.  Because a dispensing fee was paid in each example, the claim was reimbursed based on an APT lower than the reported U&C price.

115.    Some examples are supported by an internal Drug Movement Report which provides further proof of Defendants' true U&C prices to cash customers.  A Drug Movement

Report reflects all individual sales of a particular drug at a particular store for a stated time period and, among other information, sets forth for each sale the fill date, quantity and price. Except for a short time period in December, 2010 as noted in the next paragraph, payment sources have been coded in these reports as follows:

   a.  The "+" sign indicates the prescription fill was adjudicated through a private or Federal/State government insurance carrier/program;

   b.  The "$" sign indicates a 30-day supply prescription fill for a cash customer; and ,

   c.  The "*" symbol indicated 90-day supply prescription fill for a cash customer.

116. From approximately December 13 to December 22, 2010, 90-day supply prescription fills for cash customers were coded with the "+" sign, along with private and Federal/State government insurance carriers/programs.  In all other respects the coding system remained the same during that brief period.  From and after December 22, 2010, 90-day supply cash sales were again coded with the "*" symbol.

117. Additional Drug Movement Reports are included in this section immediately following the comparative examples to corroborate Defendants' true U&C prices to cash customers for the drug and time period identified in each report.

### (1). Comparative Examples

118. The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicare Part D Plan member, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the plan members' co-payment:

### Medicare Part D Example

| Prescription: | Lisinopril 20 mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Kmart pharmacy, store #7402, Bloomington Indiana | |
| Drug Acquisition Cost: | $1.27 | |
| Cash Customer 1-A Date: 07/19/09 | $3.89 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| Part D Customer 1-B Date: 06/29/09 | $2.40 | Co-payment paid by Part D beneficiary |
| | $36.91 | Submitted Charge |
| | $___ | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication[10] |
| (Part D Reimbursement) | $5.40 | Reimbursement amount paid by Medicare Part D, presumed to include recorded $1.25 dispensing fee ($4.15 + $1.25) |
| | $7.80 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and Medicare Part D reimbursement ($2.40 + $5.40) |
| Amount Medicare Should Have Paid | $1.49 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($3.89 - $2.40) |
| Over payment | $3.91 | The difference between 1) the total reimbursement paid by Medicare Part D and the amount Medicare should have paid ($5.40 - $1.49), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($7.80 - $3.89). The over payment is almost 3 times the amount Medicare Part D should have paid ($3.91 ÷ $1.49 = 2.62). |

119.    Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit E.

120.    A redacted copy of a Drug Movement Report reflecting sales of the same drug (Lisinopril 20 mg) at the same Kmart pharmacy (store # 4180) during a time period (January 1 to July 17, 2009) covering or near the transaction dates identified in the foregoing example is attached as Exhibit F and shows that Defendants charged a U&C cash price of $3.89 for every 30-day supply cash customer prescription fill (indicated by "$").

121.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicaid beneficiary, and provides a clear example of Defendants'

---

[10] The inflated U&C price fraudulently reported by Defendants is indicated in Defendants' PDX pharmacy software under the screen titled "Claim Transmit Detail."

submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C

price Defendants charged to cash customers, after crediting the Medicaid beneficiary's co-

payment:

### Medicaid Example

| Prescription: | Furosemide 40 mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Kmart pharmacy, store #4180, Louisville, Kentucky | |
| Drug Acquisition Cost: | $0.40 | |
| Cash Customer 4-A Date: 06/27/09 | $4.00 | Actual U&C price paid by the cash customer (price match), recorded by Defendants as a co-payment |
| Medicaid Customer 4-B Date: 06/30/09 | $1.00 | Co-payment paid by Medicaid beneficiary |
| | $9.79 | Submitted Charge |
| | $___ | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication[11] |
| (Medicaid Reimbursement) | $5.74 | Reimbursement amount paid by Medicaid, presumed to include recorded $3.00 dispensing fee ($2.74 + $3.00) |
| | $6.74 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and Medicaid reimbursement ($1.00 + $5.74) |
| Amount Medicaid Should Have Paid | $3.00 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($4.00 - $1.00) |
| Over payment | $2.74 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($5.74 - $3.00), or 2) the total reimbursement Defendants received and the actual U&C cash customer price ($6.74 - $4.00).  The over payment is 91% more than the amount Medicaid should have paid ($2.74 ÷ $3.00 = 0.91). |

122.    Redacted copies of screen shots printed from Defendants' PDX system which

pertain to and support the foregoing example are attached as Exhibit G.

123.    The following table summarizes and analyzes reasonably concurrent drug sales to

a cash customer and a TriCare beneficiary, and provides a clear example of Defendants'

submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C

---

[11] See footnote 10.

price Defendants charged to cash customers, after crediting the TriCare beneficiary's co-payment:

### TriCare Example

| Prescription: | Meloxicam 7.5 mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Kmart pharmacy, store #7288, Louisville, Kentucky | |
| Drug Acquisition Cost: | $0.64 | |
| Cash Customer 2-A Date: 07/23/09 | $3.89 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| Part D Customer 2-B Date: 07/16/09 | $3.00 | Co-payment paid by TriCare beneficiary |
| | $100.05 | Submitted Charge |
| | $___ | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication[12] |
| (TriCare Reimbursement) | $78.59 | Reimbursement amount paid by TriCare, presumed to include a $1.75 dispensing fee ($76.84 + $1.75) |
| | $81.59 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and TriCare reimbursement ($3.00 + $78.59) |
| Amount TriCare Should Have Paid | $0.89 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($3.98 - $3.00) |
| Over payment | $77.70 | The difference between 1) the total reimbursement paid by TriCare and the amount TriCare should have paid ($78.59 - $0.89), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($81.59 - $3.89).  The over payment is more than 87 times the amount TriCare should have paid ($77.70 ÷ $0.89 = 87.3). |

124.    Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit H.

125.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Federal Employee Health Benefits ("FEHBP") beneficiary, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the FEHBP beneficiary's co-payment:

---

[12] See footnote 10.

**FEHBP Example**

| Prescription: | Isosorb Mono 30 mg, 30-day supply | |
|---|---|---|
| Pharmacy: | Kmart pharmacy, store #4180, Louisville, Kentucky | |
| Drug Acquisition Cost: | $7.69 | |
| Cash Customer 3-A Date: 07/06/09 | $3.89 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| FEHBP Customer 3-B Date: 07/27/09 | $2.65 | Co-payment paid by FEHBP beneficiary |
| | $20.49 | Submitted Charge |
| | $___ | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication[13] |
| (FEHBP Reimbursement) | $8.06 | Reimbursement amount paid by FEHBP, including a $1.50 dispensing fee ($6.56 + $1.50) |
| | $10.71 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and FEHBP reimbursement ($2.65 + $8.06) |
| Amount FEHBP Should Have Paid | $1.24 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($3.89 - $2.65) |
| Over payment | $6.82 | The difference between 1) the total reimbursement paid by FEHBP and the amount FEHBP should have paid ($8.06 - $1.24), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($10.71 - $3.89). The over payment is more than 5 times the amount FEHBP D should have paid ($6.82 - $1.24 = 5.5). |

126.     Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit I.

127.     A redacted copy of a Drug Movement Report reflecting sales of the same drug (Isosorb Mono 30 mg) at the same Kmart pharmacy (store # 4180) during a time period (January 1 to July 18, 2009) covering or near the transaction dates identified in the foregoing example is attached as Exhibit J and shows that Defendants charged a U&C cash price of $3.89 for every 30-day supply cash customer prescription fill (indicated by "$").

---

[13] See footnote 10.

### 4.   Defendants' Formulary-Based 90-Day Supply Prescription Fill Scheme

128.   As referenced in Section VII, subsection A.3.a., in or about May of 2006, Defendants initiated a formulary-based, discount generic drug program dubbed "Generics+," which offered a 90-day supply of covered medications to customers for $10, $15, or $25, depending on the drug.  Most of the drugs on the 90-day supply formulary are sold for $10.  The Generics+ program also offered a select group of 30-day supply acute-use drugs for $5.  "Acute" drugs are distinguished from "maintenance" drugs in that it is anticipated a patient will need only one supply of an acute drug regimen to compete a course of treatment, whereas a patient with a continuing need takes maintenance drugs which are periodically refilled.  The original 90-day supply Generic+ formulary consisted of approximately 200 or more drugs, and the current formulary consists of approximately 400 drugs.  Defendants' most recent Generics+ prescription formulary is attached as Exhibit K.

129.   With the implementation of the Generics+ program, Defendants added "RMP," an acronym for Retail Maintenance Program, as a payer selection in the third party payer section of the patient profile in their pharmacy management system.  In some instances, RMP was added as a third party payer selection, along with any third party primary and secondary payer insurance coverage, when a patient profile was first created on a customer's initial visit to the pharmacy. In other instances, the RMP payer selection was added the first time a customer purchased a 90-day supply of a drug on the RMP formulary for cash.  Since the introduction of the CIM payer selection discussed above, it is common for pharmacy staff to enter the CIM and RMP payer selections and any third party insurance coverage when a patient profile is first created.

130.   RMP is used by Defendants to identify, process, and track <u>all</u> 90-day supply formulary drug <u>cash sales</u>.  With RMP, Defendants are able to track 90-day cash sales on a company-wide, district, or other selected store level.

131.   Some of the differences between Defendants' formulary-based, 90-day supply RMP scheme and their non-formulary-based, cash override, 30-day supply scheme, include the following variances:

a.   A cash sale of a 90-day supply of a drug that is not on the formulary cannot be processed as an RMP payer transaction.  The sale instead would have to be processed as a Cash (pre-October 2008)/CIM (post-September 2008) payer transaction.

b.   The pre-set, fixed discount price of a drug on the 90-day supply formulary cannot be   overridden by pharmacy staff.

c.   No price match of a competitor price can be processed as an RMP payer transaction.  For example, Wal-Mart has both a 30-day supply and a 90-day supply formulary. If   Wal-Mart sells a 90-day supply of discount generic drug for $10 which Defendants sells for $15, to match the price Defendants processes the sale as a Cash (pre-October 2008) or CIM (post-September 2008) payer transaction.

d.   The fixed discount price of a drug on the 90-day supply formulary cannot be prorated downward.  For example, if a prescription for a 30-day supply of a drug is processed with RMP as the payer, the price will be the same $10, $15, or $25 charge   as for a 90-day supply.  However, the 90-day supply formulary fixed discount price is automatically prorated upward within PDX.  For instance, if a customer presents a prescription for a   120-day supply of a $15 90-day supply formulary drug, the price will be $20.

e.   Defendants use a third party pharmacy management services provider to process their RMP cash sales along with their actual third party payer claims while CIM is processed in house.

132.   As indicated, RMP is <u>not</u> an actual Third Party insurance carrier.  When RMP is selected as the payer and used to process a cash sale of a 90-day supply formulary drug, the customer pays the entire amount of the cash price, no part of the cash price is paid by an actual

third party payer, and no claim is submitted by Defendants to any third party payer that is not reversed (See Section VII, subsection A.3.a.).

133.    Although RMP is not an actual insurance carrier, in a number of respects Defendants treat it as a third party insurance carrier within their pharmacy transaction software system.  As mentioned above, RMP is listed as an option in the third party payer section of the pharmacy software, along with any actual third party primary and secondary payers.  RMP gives the appearance of an acronym or abbreviation of an insurer or plan name, the same as with true third party payers and plans which are generally identified by acronyms or abbreviated descriptions of their names.  On 90-day supply formulary drug cash transactions, (i) RMP is listed in the "Carrier" field of the "DUR [Drug Utilization Review] and Xmit/Reject Information" screen, and (ii) "Retail Maintenance Program" is listed in the field of the "Prescription Filling" screen where a third party payer is listed when Defendants submits a claim for payment under insurance coverage.

134.    An outside reviewer could easily be given the false impression and misled to incorrectly conclude RMP is just another health care insurer, based on Defendants' similar treatment of RMP and third party insurance carriers in their system.  This treatment masks the cash payment nature of the RMP transactions and makes them appear as third party payer transactions.  As an intended result, the RMP cash transactions would be erroneously overlooked as a basis for establishing or calculating Defendants' true U&C prices.  This facilitates Defendants' deliberate RMP program design and objective to use generic discount drug pricing to compete for customer base and store traffic, and at the same time conceal their true U&C prices and claim and receive payments for sales of discount drugs to GHP beneficiaries at materially higher prices, in knowing violation of GHP reimbursement rules.

135.    The discount price for each drug on the 90-day supply formulary is preset in Defendants' pharmacy management software and automatically charged by the system when RMP is selected as the payer.

136.    Defendants customarily sold the drugs on their 90-day supply formulary to cash and certain insured customers at the every-day discount prices preset in their system for RMP cash transactions, with certain exceptions.  As discussed below, the exceptions include Defendants' unlawful sale of the same 90-day drug supplies to GHP beneficiaries at materially higher prices and Defendants' submission of false claims to GHPs for excessive reimbursement.

137.    Whether Defendants sold a drug on the 90-day supply formulary at the RMP cash transaction price or a higher price depended on several factors, including whether the customer was a cash customer or a customer utilizing insurance coverage with a copay higher or lower than the discount drug program price.

138.    When a cash customer presented a prescription for a 90-day supply of a drug which was not on the Defendants formulary, the sale could not be processed with RMP as the payer and had to be processed as a Cash /CIM transaction instead.

139.    Defendants routinely sold drugs on the 90-day supply formulary to customers at the preset, every-day low RMP cash prices in each of the following instances:

    a.      When the purchase was made by a cash customer.

    b.      When the purchase was made by a GHP beneficiary, or other insured customer, with a copay higher than the RMP cash price.

140.    Defendants' sales of 90-day supplies of drugs to customers at their every-day low RMP cash prices establish Defendants' true U&C prices for those drugs under the rules of many, if not most, GHPs.

141.   Conversely, Defendants unlawfully sold the same 90-day supplies of formulary drugs to GHP beneficiaries at prices materially higher than the actual U&C RMP cash prices they routinely charged to other customers, and knowingly and unlawfully submitted false claims with fraudulent, inflated U&C prices to GHPs for payment, in the following instances:

    a.   When the purchase was made by a GHP beneficiary, or other insured customer, with a copay <u>lower</u> than the RMP cash price.

    b.   In some instances, when the purchase was made by a GHP beneficiary, or other insured customer, and notwithstanding that the copay was <u>higher</u> than the RMP cash price.   The GHP beneficiary, as well as the GHP, was defrauded in these cases, since Defendants did not disclose or offer the true U&C price to the beneficiary and the beneficiary paid a copay materially higher than the true U&C.

142.   These claims were false because Defendants' fraudulent reports of inflated U&C prices misled GHPs to pay Defendants excessive reimbursement based on APTs which were lower than the falsely reported U&C prices, but materially higher than the true U&C prices.

143.   There is no reasonable basis on which Defendants may justify charging for the same drug:  i) their U&C RMP price to a GHP beneficiary with a copay higher than the RMP price; and ii) a higher price to a GHP beneficiary with a copay lower than the RMP price.  One reasonable explanation is that Defendants wished to conceal their unlawful conduct from GHP beneficiaries who might question the practice and alert their GHPs.

    a.   **Supporting Information/Internal E-mails and other communications**

144.   The following K-mart e-mail communications confirm or disclose:   (i) that Defendants used the RMP payer designation to identify 90-day supply cash sales; (ii) Defendants' knowledge that cash prices determine U&C prices; (iii) Defendants' untenable contention that RMP cash prices are not Defendants' cash prices and Defendants' U&C prices

are higher, because RMP cash transactions "go through" a third party; and (iv) Defendants'

representation and treatment of RMP as a "3rd party."

    a.    July 1, 2009 e-mail exchange between Relator and Kmart District Manager Ryan Cruser, collectively attached as Exhibit L, concerning the following question:  When a pharmacy staff member chooses, or an insured customer requests a pharmacy staffer, to submit a claim to the customer's third party payer for a 90-day supply of a drug on the RMP formulary, should the staffer override the submission price to match the $10/$15 RMP discount price or allow the pharmacy management system to submit the programmed price.  In response, Cruser instructed Relator not to override the programmed price and stated that, because Defendants "go through a 3rd party for our 90 day supply meds. . .," the $10/$15 RMP prices are not Defendants' cash prices and Defendants' U&C prices are higher than those prices.

        It is reasonable to presume that an insured customer would not ask, or have a need to ask, the pharmacy to submit a claim to the customer's carrier when he could purchase RMP formulary drugs at a cash price lower than his co-pay.  It is in situations where the co-pay was lower than the RMP cash price, that a customer would want the pharmacy to submit a claim to his insurance carrier for payment of the balance of the prescription price.  Cruser's instruction in such instances resulted in the submission of third party claims, including GHP claims, based on prices materially higher than the programmed RMP cash prices for the same drugs. In any event, an insured customer's copay amount relative to the RMP cash price, for the purchase of the same drug, is not a lawful basis for Defendants to charge the customer the every-day low RMP cash price in one instance and a higher price adjudicated through third party insurance coverage in another instance. Defendants clearly controlled and manipulated the transactions to their advantage and to the damage of third party payers, including GHPs, and many times customers.

    b.    July 20, 2009 e-mail exchange between Relator and Kmart District Manager Ryan Cruser, collectively attached as Exhibit M, concerning the following several questions:

        i.    Can pharmacy staff members prorate 90-day supply RMP formulary drugs and prices downward to fill 30-day supply prescriptions?  Cruser instructed Relator not to over ride the programmed RMP cash price amounts, because of U&C pricing considerations and because "RMP is a 3rd party plan."

ii.    Why would prorating a 90-day supply RMP formulary drug price downward to fill 30-day supply prescription adversely affect RMP third party status? Cruser responded that a prorated price is not the agreed price and that by prorating the RMP price "you are not running it through the 3rd party any longer." Cruser further stated an RMP price could be prorated up, but not down.

**b.**    **Representative Examples of Defendants' False Claims for 90-Day Supply Prescription Fills and Supporting Drug Movement Reports**

145.    The examples in this subsection document and compare Defendants' fraudulent and abusive GHP claim submission practices relative to the U&C prices Defendants charge to cash customers for 90-day supply formulary drug prescription fills.

146.    In each of the following comparative examples, a GHP beneficiary and a cash customer had the same 90-day supply drug prescription filled at the same Kmart pharmacy during the same relevant time period, and Defendants recorded the cash sale as an RMP transaction.

147.    The examples, individually and collectively, corroborate: 1) Defendants' true U&C prices to cash customers for various drugs; 2) Defendants' fraudulent practice of identifying "RMP" as the primary payment "Carrier" on 90-day supply cash transactions for the purpose of disguising and misrepresenting cash transactions as covered health insurance claims; 3) Defendants' fraudulent submission on GHP claims of false, inflated U&C prices materially greater than the actual U&C prices charged to cash customers; and 4) GHP payment of amounts to Defendants materially greater than the balances remaining unpaid, after beneficiary co-payments, on the actual U&C prices charged to cash customers, as a consequence of the Defendants' reporting of false, inflated U&C prices to GHPs.

46

148.     With respect to the "Submitted Charge" listed in each example, it was Defendants' usual practice to set the charge on third party claims based on i) the AWP reported by the manufacturer to third party pricing services, plus ii) $5.  Virtually no one ever paid or pays the published AWP price, much less the higher Submitted Charge.

149.     Each example confirms Defendants' fraudulent report of an inflated list U&C price, even though the specific reported price is unknown.  As indicated above, GHP reimbursement rules mandate payment of the lower of U&C price or an APT, and a dispensing fee is not paid when a claim is reimbursed based on a U&C price.  Because a dispensing fee was paid in each example, the claim was reimbursed based on an APT lower than the reported U&C price.

150.     Some examples are supported by a Drug Movement Report which provides further proof of Defendants' true U&C prices to cash customers.

### (1).     Comparative Examples

151.     The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicare Part D Plan member, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the plan member's co-payment:

### Medicare Part D Example

| Prescription: | Amlodipine 10 mg, 90-day supply | |
|---|---|---|
| Pharmacy: | Kmart pharmacy, store #4180, Louisville, Kentucky | |
| Drug Acquisition Cost: | $5.94 (RMP) / $4.11 (Part D) | |
| Cash Customer 7-A<br>Date:  07/02/09 | $15.00 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| Part D Customer 7-B<br>Date: 06/16/09 | $5.43 | Co-payment paid by Part D beneficiary |

| | | |
|---|---|---|
| | $218.88 | Submitted  Charge (AWP + $5) |
| | $183.99 | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication |
| **(Part D Reimbursement)** | $30.77 | Reimbursement amount paid by Part D, including a $2.00 dispensing fee ($28.77 + $2.00) |
| | $36.20 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and Part D reimbursement ($5.43 + $30.77) |
| **Amount Part D Should Have Paid** | $9.57 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($15.00 - $5.43) |
| **Over payment** | $21.20 | The difference between 1) the total reimbursement paid by Part D and the amount Part D should have paid ($30.77 - $9.57), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($36.20 - $15.00).  The over payment is more than 2 times the amount Part D should have paid ($21.20 - $9.57 = 2.21). |

152.    Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit N.

153.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a Medicaid beneficiary, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the Medicaid beneficiary's co-payment:

### Medicaid Example

| | | |
|---|---|---|
| **Prescription:** | Benazepril 40 mg, 90-day supply | |
| **Pharmacy:** | Kmart pharmacy, store #4180, Louisville, Kentucky | |
| **Drug Acquisition Cost:** | $7.40 (RMP) / $5.18 (Medicaid) | |
| **Cash  Customer 10-A Date:  05/31/09** | $10.00 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| **Medicaid Customer 10-B Date:  04/07/09** | $1.00 | Co-payment paid by Medicaid beneficiary |
| | $53.99 | Submitted Charge |
| | $___ | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication[14] |

---

[14] See footnote 10.

| | | |
|---|---|---|
| (Medicaid Reimbursement) | $33.93 | Reimbursement amount paid by Medicaid, presumed to include recorded $5.00 dispensing fee ($28.93 + $5.00) |
| | $34.93 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and Medicaid reimbursement ($1.00 + $33.93) |
| Amount Medicaid Should Have Paid | $9.00 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($10.00 - $1.00) |
| Over payment | $24.93 | The difference between 1) the total reimbursement paid by Medicaid and the amount Medicaid should have paid ($33.93 - $9.00), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($34.93 - $10.00).  The over payment is almost 3 times the amount Medicaid should have paid ($24.93 ÷ $9.00 = 2.7). |

154.     Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit O.

155.     The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a TriCare beneficiary, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the TriCare beneficiary's co-payment:

**TriCare Example**

| | | |
|---|---|---|
| Prescription: | Amlopidine 10 mg, 90-day supply | |
| Pharmacy: | Kmart pharmacy, store #4180,Louisville, Kentucky | |
| Drug Acquisition Cost: | $4.11 (RMP) / $5.94 (TriCare) | |
| Cash Customer 8-A Date: 07/15/09 | $15.00 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| TriCare Customer 8-B Date: 06/02/09 | $9.00 | Co-payment paid by TriCare beneficiary |
| | $218.60 | Submitted Charge |
| | $183.99 | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication |
| (TriCare Reimbursement) | $11.25 | Reimbursement amount paid by TriCare, including a $2.25 dispensing fee ($9.00 + $2.25) |
| | $20.25 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and TriCare reimbursement ($9.00 + $13.50) |

| Amount TriCare Should Have Paid | $6.00 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($15.00 - $9.00) |
|---|---|---|
| Over payment | $5.25 | The difference between 1) the total reimbursement paid by TriCare and the amount TriCare should have paid ($11.25 - $6.00), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($20.25 - $15.00). The over payment is 87% more than the amount TriCare D should have paid ($5.25 ÷ $6.00 = 0.87%). |

156.    Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit P.

157.    A redacted copy of a Drug Movement Report reflecting sales of the same drug (Amlodipine 10 mg) at the same Kmart pharmacy (store # 4180) during a time period (January 1 to July 22, 2009) including the transaction dates identified in the foregoing example is attached as Exhibit Q and shows that Defendants charged a U&C cash price of $15.00 for every 90-day supply cash customer prescription fill (indicated by "*").

158.    The following table summarizes and analyzes reasonably concurrent drug sales to a cash customer and a FEHBP beneficiary, and provides a clear example of Defendants' submission of a false claim to the GHP for more than the balance remaining unpaid on the U&C price Defendants charged to cash customers, after crediting the FEHBP beneficiary's co-payment:

**FEHBP Example**

| Prescription: | Pravastatin 40 mg, 90-day supply | |
|---|---|---|
| Pharmacy: | Kmart pharmacy, store #4180, Louisville, Kentucky | |
| Drug Acquisition Cost: | $13.33 | |
| Cash Customer 9-A Date: 07/20/09 | $15.00 | Actual U&C price paid by the cash customer, recorded by Defendants as a co-payment |
| FEHBP Customer 9-B Date: 07/28/09 | $6.69 | Co-payment paid by FEHBP beneficiary |
| | $436.50 | Submitted Charge |

| | | |
|---|---|---|
| | $____ | Inflated U&C price fraudulently reported by Defendants for claim submission and adjudication[15] |
| **(FEHBP Reimbursement)** | $31.39 | Reimbursement amount paid by FEHBP, including a $1.50 dispensing fee ($29.89 + $1.50) |
| | $38.08 | Total reimbursement received by Defendants, comprised of the beneficiary co-payment and FEHBP reimbursement ($6.69 + $31.39) |
| **Amount FEHBP Should Have Paid** | $8.31 | The difference between Defendants' actual U&C cash customer price and the beneficiary's co-payment ($15.00 - $6.69) |
| **Over payment** | $23.08 | The difference between 1) the total reimbursement paid by FEHBP and the amount FEHBP should have paid ($31.39 - $8.31), or 2) the total reimbursement Defendants received and the actual U&C customer cash price ($38.08 - $15.00).  The over payment is almost 3 times more than the amount FEHBP should have paid ($23.08 ÷ $8.31 = 2.77). |

159.     Redacted copies of screen shots printed from Defendants' PDX system which pertain to and support the foregoing example are attached as Exhibit R.

### (2).     Drug Movement Report Representative Example

160.     A redacted copy of a Drug Movement Report reflecting sales of Lisinopril 20 mg at Kmart pharmacy store #4180 during the time period from January 1 to July 17, 2009 is attached as Exhibit F and shows that Defendants charged a U&C cash price of ($10.00) for every 90-day supply cash customer prescription fill (indicated by "*").

161.     A redacted copy of a Drug Movement Report reflecting sales of Isosorb Mono 30 mg at Kmart pharmacy store # 4180 during the time period from January 1 to July 28, 2009 is attached as Exhibit J and shows that Defendants charged a U&C cash price of ($10.00) for every 90-day supply cash customer prescription fill (indicated by "*").

### 5.     Prescription Savings Club

162.     In the latter part of 2009, Defendants initiated a program called the Prescription Savings Club ("PSC").  PSC customers pay a $10 annual enrollment fee to receive certain 30-day and 90-day supplies of pharmaceuticals at discounted rates.

---

[15] See footnote 10.

163.    During the first few months of the PSC program, members were eligible to purchase certain 30-day prescriptions of certain generic pharmaceuticals at a price of five dollars ($5) or less, and certain 90-day prescriptions of certain generic pharmaceuticals for fifteen dollars ($15) or less.

164.    Unlike similar programs offered by their national competitors, Defendants' PSC is offered to all pharmacy customers, including customers with government provided insurance. As such, by paying an annual fee of $10, government insured customers are permitted to receive certain generic pharmaceuticals at a discounted rate, but Defendants submit claims for reimbursement without disclosing to the government the lower usual and customary prices which are actually charged.

165.    On September 2010, to attract more customers to their PSC program, Defendants modified their PSC program to include all the 30-day and 90-day pharmaceuticals listed on RMP for a discounted rate.  Additionally, on September 23, 2010, Defendants' Third Party Support representative, Elisabeth Smith, sent an email to Defendants' pharmacy staff, attached hereto as Exhibit S, stating that PSC members could now obtain 30-day supplies of certain generic pharmaceuticals for $3.50 rather than the $4 or $5 Defendants' charge to CIM and RMP customers.

166.    Accordingly, Defendants' U&C price for certain 30-day supplies of generic pharmaceuticals will invariably shift from the $3.89 to $4 Defendants' charge to cash customers under CIM to the $3.50 Defendants charge to PSC customers.

**D.    Illegal Remunerations to Government Healthcare Program Beneficiaries**

**1.    Overview**

167.     The Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits providers such as Defendants from competing for business by giving illegal remunerations to GHP beneficiaries.  Analogous state statutes contain similar anti-kickback provisions.  See by way of example and not limitation, e.g., Florida, FLORIDA STAT. CH. 409.920(2)(e); Illinois, 305 ILCS 5/8A-3(c); Kentucky, 39 KY. REV. STAT. 21ANN. § 216.2950; MICH. COMP. LAWS 400.601; Texas, HUMAN RESOURCES CODE § 36.002(13).

168.     From at least 2006 and continuing to the present, in order to increase general merchandise sales, pharmacy volume, and revenue from GHPs, Defendants implemented a series of pharmacy incentive programs which paid GHP beneficiaries various forms of kickbacks in the form of merchandise coupons and cash gift cards of up to $100 to induce GHP beneficiaries to purchase their prescription drugs at Defendants' pharmacies.

### 2.     Gift Card Incentive Programs

169.     Since at least 2006 to June of 2009, Relator has personal knowledge that Defendants' pharmacies independently offered an incentive program which distributed cash gift cards for customers who transferred their physician prescription orders from another pharmacy to one of Defendants' pharmacies.  While Defendants' corporate officers authorized the incentive programs, the offer was mainly driven at the store-level and relied upon local advertising.

170.     Defendants' gift card incentive program was offered to all pharmacy customers, including GHP beneficiaries.

171.     Beginning in July of 2009, Defendants offered their first nationwide gift card incentive program which distributed cash gift cards in amounts up to $100 for any pharmacy customer who transferred their physician prescription orders from another pharmacy to one of Defendants' pharmacies.

172.     From July 12, 2009 to August 22, 2009, Defendants offered their "Smart Squad" Pharmacy Transfer Program promotion (hereinafter "Smart Squad I").  The Smart Squad I promotion paid customers $25 in the form of a gift card for transferring any prescription from a competitor's pharmacy to one of Defendants' pharmacies. (Exhibit T).

173.     According to Defendant's promotional flier, attached hereto as Exhibit U, a customer could receive up to $100 worth of gift cards, and the offer was valid in every State except Arkansas, New York, Louisiana (for controlled-substance prescriptions), and New Jersey (for prescriptions for customers over the age of 60).

174.     From July 12, 2009 to August 22, 2009, Defendants' Smart Squad I promotion redeemed 49,729 gift cards worth a total of $1,016,502.

175.     Defendants' records demonstrate that Defendants' pharmacies also experienced a 2% increase in the number of non-pharmacy customers who began utilizing Defendants' pharmacies during the Smart Squad I promotion.  Defendants' calculated that for every $1 of cash card value redeemed, the customer spent an additional $1.74 on purchases.  Thus, according to Defendants, a $25 cash card equated to an additional $43.50 in sales.

176.     Because the Smart Squad promotion significantly increased Defendants' sales and profits, management pushed Defendants' employees to promote it, even offering employees substantial compensation incentives for processing large numbers of transferred prescriptions.

177.     Relator understood that GHP beneficiaries were legally prohibited from receiving gift cards, but Defendants' PDX system was not set up to flag or identify GHP beneficiaries to keep them from receiving gift cards.  As a consequence, GHP beneficiaries routinely received gift cards.

178.     On July 27, 2009, Relator submitted Ticket# 1661711 (attached as Exhibit V) to Defendants' Pharmacy Operations & Administration Department asking whether government

54

insured customers were in fact eligible for Defendants' gift card promotions.  Tonya M. Burke, a representative from Defendants' Operations & Administration Department, responded that "Any patient who receives their scripts through a government funded prescription plan is legally excluded to participate in the Pharmacy Transfer Program."  (Defendants' Response is attached as Exhibit W).

179.    Defendants, however, made no effort to exclude GHP beneficiaries from receiving these pharmacy kickbacks until November, 2009 when Defendants hard-wired their PDX system to alert pharmacy staff that a prescription was to be billed to a GHP and, therefore, the customer was ineligible to receive a gift card.

180.    Defendants' Smart Squad I coupon distributions and redemptions substantially declined after Defendants' PDX smart-system was implemented.  From July 12, 2009 to August 22, 2009, which was prior to the period in which Defendants' PDX smart-system went into effect, 49,729 gift cards worth a total of $1,016,502 were redeemed.  In contrast, from October 11, 2009 to November 21, 2009, after Defendants implemented their PDX smart-system, only 18,200 gift cards worth a total of $348,978 were redeemed.

181.    The PDX smart-system resulted in a significant decrease in gift card distributions to GHP beneficiaries.  As a result, Defendants' instructed pharmacy staff to circumvent the PDX smart-system in order to continue to provide pharmacy gift card coupons to GHP beneficiaries.

182.    On or about January 31, 2010, Defendants instituted a new version of the "Smart Squad" promotion ("Smart Squad II").  Defendants' Smart Squad II promotion offered customers up to $25 in gift cards for each prescription transferred, and up to $100 in gift cards if they transferred four (4) prescriptions to Defendants' pharmacy.

183.    Unlike Smart Squad I, Smart Squad II was implemented at the outset with the PDX smart-system in place to prevent GHP customers from obtaining Smart Squad II gift cards.

Defendants' PDX smart-system was successful in preventing most GHP customers from receiving Smart Squad II gift cards. Consequently, Defendants' Smart Squad II promotion was relatively unsuccessful when compared to the Smart Squad I promotion carried on without the PDX smart-system flagging GHP beneficiaries.

184.    Relator's District Manager, Ryan Cruser, sent out numerous emails, collectively and chronologically attached hereto as Exhibit X, to Defendants' pharmacies in Relator's district lamenting that the Smart Squad II promotion was failing to produce numbers as successful as Smart Squad I.   During both a January 29, 2010, teleconference and in a June 1, 2010, email, attached hereto as Exhibit Y, Cruser demanded that pharmacy staff do whatever was necessary to increase Smart Squad II's gift card distribution numbers and stated: "don't trouble yourself with being the coupon police," which meant that Defendants' staff were to circumvent the PDX smart-system and otherwise freely give coupons to GHP beneficiaries who transferred their prescriptions to one of Defendants' pharmacies.

185.    Relator became aware that the PDX smart-system was being manipulated to allow GHP beneficiaries to continue to receive coupons.  On July 21, 2010, while working at Defendants' pharmacy in store 4830 in Florence, Kentucky, Relator discovered that Defendants' PDX smart-system did not prevent a customer with federal employee PCS/Caremark insurance coverage from receiving pharmacy gift card coupons.  Relator submitted a help-ticket to Defendants' corporate office to inquire why some customers with federal employee insurance coverage were being flagged by PDX at the point of sale while others were not.   In response, Defendants' corporate representative, Tonya M. Burke, indicated that PCS/Caremark had not been identified in the PDX system as a government insurance carrier when in fact it was such a carrier. Instead, PCS/Caremark was identified as "NOT SPECIFIED" with respect to government insurance in Defendants' PDX system.  See Exhibit Z.

186.     On July 30, 2010, while working at Defendants' pharmacy at store 4830 in Florence, Kentucky, Relator discovered that PDX failed to prevent another customer with federal employee PCS/Caremark insurance coverage from receiving pharmacy coupons.  To verify his previous suspicions that the customer's PCS/Caremark coverage was government funded, Relator called PCS/Caremark and confirmed that the relevant customer had federal employee insurance coverage.

187.     In situations where the PDX smart-system flagged a customer as a GHP beneficiary ineligible for the Smart Squad II coupons, Defendants instead provided the customers with $10 On-Time Guarantee ("OTG") gift cards in place of the prohibited Smart Squad II gift cards.  See Exhibit AA.

188.     In order to avoid detection of these unlawful coupon distributions, Defendants instructed pharmacy staff to administer the $10 gift card in a separate transaction, independent of the GHP beneficiary prescription purchase.

189.     On January 29, 2010, Relator sent an email to District Manager Cruser to clarify his teleconference instructions relative to OTG gift card distribution.  Most importantly, Relator asked, "If a customer comes in and the register recognizes that because of the payor source we are not allowed to give a gift card are we to give the customer a $10 on time gift card?"  Cruser responded, "Yes, use OTG [On Time Guarantee] card."  See, Exhibit BB.

190.     Recently, on December 17, 2010, Defendants' Director of Managed Care Services, Michael Hamilton, sent an email to Defendants' pharmacies that provided, among other things, Defendants' position with regard to the legality of their incentive programs. Specifically, when asked whether "it is illegal to give special incentives for government programs to get people to come to your pharmacy," Defendants responded that "[t]he word 'incentive' refers to money/goods given to the customer in exchange for transferring their

prescriptions (i.e., $25, 25,000 bonus points, free product, etc). Co-pay differentials for preferred / non-preferred networks are not considered 'incentives.'"  See, Exhibit CC.

191.    Effective March 23, 2010, the Patient Protection and Affordable Care Act ("PPACA") amended the federal Civil Monetary Penalty Anti-Kickback statute by adding new safe harbor provisions.  Specifically, PPACA provided that the following should not be considered a "Remuneration" in the context of the Anti-Kickback statute:

> [T]he offer or transfer of items of services for free or less than fair market value by a person, if: (i) the items or services consist of coupons, rebates, or other rewards from a retailer; (ii) the items or services are offered on equal terms available to the general public, regardless of health insurance status; and (iii) the offer or transfer of the items or services is not tied to the provision of other items or services reimbursed in whole or in part by a program under title XVIII or a State health care program...

42 U.S.C.A. § 1320a-7a(i)(6)(G).

192.    Initially, it should be noted that the Civil Monetary Penalty Anti-Kickback statute (42 U.S.C. 1320a-7a) is separate and distinct from the Criminal Penalties for Acts Involving Federal Health Care Programs statute (42 U.S.C. 1320a-7b).  Relator alleges that Defendants violated the latter Criminal Penalties statute, which has its own exhaustive list of safe harbors. As such, PPACA's amendment to the Civil Monetary Penalty statute has no bearing on this case.

193.    Nevertheless, assuming Defendants' conduct was analyzed under the Civil Monetary Penalties statute, although their program may satisfy the first two components of section 1320a-7a(i)(6)(G), Defendants' gift card scheme is inherently linked with pharmaceutical drugs that are reimbursed in whole or in part by a GHP.  As such, Defendants' illegal remuneration programs are outside the scope of the safe harbor and are in continuing violation of the Anti-Kickback statute.

194.   Furthermore, regardless of PPACA's impact on the Anti-Kickback statute, it remains clear that Defendants' illegal remuneration programs that occurred from at least 2006 to March 23, 2010, violated the Federal and State Anti-Kickback statutes.

### 3.   $1 Rewards Program

195.   Beginning on or about April 7, 2009, Defendants initiated their "$1 Rewards Program," which offered customers who purchased any prescription from one of Defendants' pharmacies to choose from ten (10) store-brand over-the-counter pharmaceuticals for one dollar ($1).  (Exhibit DD).  The "$1 Rewards Program" flier states that the offer is not valid for those customers whose prescriptions were paid in whole or in part by any government program. Defendants, however, did not enforce the prohibition against GHP beneficiary participation in the program.

### 4.   Coupon Matching Program

196.   Defendants offer a program by which they match any coupons offered by a competitor pharmacy.  Defendants' PDX software tracks the origin and amount of the competitor's coupons in order to maintain records of the amounts Defendants expend in matching competitor coupons.  Defendants do not screen for, or exclude, GHP beneficiaries from participating in the coupon matching program. For example, Exhibit EE shows a $30 Rite Aid pharmacy coupon presented to Defendants by a government insured customer.  The coupon was honored by Defendants who paid the GHP beneficiary a kickback of $30 for having their prescription filled at Defendants' pharmacy.

### 5.   Shop Your Way Rewards Program

197.   In September of 2010, Defendants unveiled another illegal remuneration program titled "Shop Your Way Rewards." This program allows Defendants' pharmacy customers to earn points for every prescription purchase made at one of Defendants' pharmacies.  Defendants'

pharmacy customers receive a Reward Card when they become a "Shop Your Way Rewards" member by signing up for the program either online at *shopyourwayrewards.com* or in person at one of Defendants' pharmacies.  When a member purchases a prescription at one of Defendants' pharmacies, Defendants' pharmacy staff adds points to the member's Reward Cards.  Defendants' pharmacy customers earn five hundred (500) points, which equates to fifty cents ($.50), for every prescription purchase. In addition, for every fifth prescription purchase, Reward Card members receive an additional 500 point bonus.

198.    On November 24, 2010, Relator received an email from Defendants' Interim Director of Pharmacy Operations, Timothy Weber, revealing new bonus point opportunities Defendants are offering under their Reward Card Program, including 10,000 bonus points (or $10.00) for enrolling in Defendants' prescription auto-fill program, and 25,000 bonus points ($25.00) for each transferred prescription (up to four).  A copy of Weber's email is attached as Exhibit FF.

199.    Unlike many of their national competitors' reward point programs, Defendants' reward point program is offered to GHP beneficiaries.  In fact, Rite Aid's new reward card program, titled "Wellness+", specifically excludes from their program all prescriptions "paid for in whole or in part by state or federal healthcare programs such as Medicare or Medicaid."  As such, Defendants' reward point program violates Federal and State Anti-Kickback statutes.

## COUNT I – *FEDERAL FALSE CLAIMS ACT*

200.    Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

201.    With respect to pharmaceuticals on Defendants' written RMP formulary , which appear to have been adjudicated by a third-party administrator, Defendants have knowingly engaged, and continues to engage, in the fraudulent pattern and practice of submitting claims for

reimbursement to GHP at inflated prices that deny the United States the lower Usual and Customary prices offered to Defendants' cash paying customers.

202.    With respect to pharmaceuticals sold pursuant to Defendants' meet-or-beat policies adjudicated in-house under Defendants' illusory CIM carrier, Defendants have knowingly engaged, and continues to engage, in the fraudulent pattern and practice of submitting claims for reimbursement to GHP at inflated prices that deny the United States the lower Usual and Customary prices offered to Defendants' cash paying customers.

203.    In an effort to increase its market-share, general merchandise sales, pharmacy volume and revenue from GHPs, Defendants knowingly engaged, and continue to engage, in the pattern and practice of distributing illegal remunerations to new and transferred GHP pharmacy customers.

204.    Defendants have failed to disclose to the Government any of their distributions of illegal remunerations to their GHP customers described in Paragraph 63 and, therefore, Defendants' do not qualify for any of § 1320a-7b's safe harbor provisions and every claim Defendants have submitted to GHPs for payment of prescriptions dispensed to those customers to whom it provided the illegal remuneration is false.

205.    As alleged in Paragraph 50 above, the Federal Government pays a share of the medical assistance expenditures under each State's Medicaid program known as the FMAP or FFP.

206.    The payment by the various States' Medicaid programs on the Defendants' false and fraudulent Medicaid clams resulted in the Federal Government paying an inflated FMAP and/or FFP which it should not have been paid.

207.    That 31 U.S.C. § 3729 of the FCA states in pertinent part as follows:

(a) LIABILITY FOR CERTAIN ACTS

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D)     has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E)     is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F)     knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

208.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to federal and state government healthcare programs ("GHP" in the singular form and "GHPs" in the plural form) for payment or approval.

209.    Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent GHP claims paid or approved by the Government.

210.    Defendants defrauded the Government by getting false or fraudulent claims allowed or paid.

211.    The Government, unaware of the falsity of the records, statements or claims made by Defendants, paid Defendants for claims that would otherwise not have been allowed.

212.    Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the Government.

213.    By reason of these payments, the Government has been damaged and continues to suffer damages in a substantial amount.

214.    The Government unaware of the falsity of the claims made by Defendants and lacking knowledge of the above described fraudulent acts, relied on the accuracy of Defendants reimbursement claims to GHPs to its detriment.

215.    The Government, being unaware of the inaccuracies and documentation deficiencies submitted by Defendants, paid and continues to pay Defendants for claims that should not have been, and should not be paid, based upon Defendants' false and fraudulent reimbursement claims to GHP reimbursement claims.

## COUNT II - *CALIFORNIA FALSE CLAIMS ACT*

216.    Relator incorporates by reference and re-alleges Paragraphs 1-199 as if fully set forth herein.

217.    This action is brought by Relator pursuant to the Submission of False Claims to the State of California in violation of California False Claims Act, CAL. GOV'T. CODE § 12650, et seq.

218.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

*COUNT III – COLORADO MEDICAID FALSE CLAIMS ACT*

219.    Relator incorporates by reference and re-alleges Paragraphs 1-199 as if fully set forth herein.

220.    This action is brought by Relator pursuant to the Submission of False Claims to the State of Colorado in violation of the Colorado Medicaid False Claims Act, COL. STAT. § 25.5-4, et seq.

221.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT IV – *DELAWARE FALSE CLAIMS AND REPORTING ACT*</u>

222.    Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

223.    This action is brought by Relator pursuant to the Submission of False Claims to the State of Delaware in violation of the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201 et seq.

224.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT V - *FLORIDA FALSE CLAIMS ACT*</u>

225.    Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

226.    This action is brought by Relator pursuant to the Submission of False Claims to the State of Florida in violation of the Florida False Claims Act, FLA. STAT. § 68.081, et seq.

227.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT VI - *GEORGIA FALSE MEDICAID CLAIMS ACT*</u>

228.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

229.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Georgia in violation of the Georgia False Medicaid Claims Act, GA. CODE ANN, § 49-4-146, <u>et seq</u>.

230.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT VII - *HAWAII FALSE CLAIMS ACT*</u>

231.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

232.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Hawaii in violation of the Hawaii False Claims Act, HAW. REV. STAT. § 661-22 <u>et seq</u>.

233.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT VIII - *ILLINOIS FALSE CLAIMS ACT*</u>

234.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

235.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Illinois in violation of the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, <u>et seq</u>.

236.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT IX – *INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT*

237.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

238.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Indiana in violation of the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-1, et seq.

239.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT X - *LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW*

240.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

241.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Louisiana in violation of the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:437.1, et seq.

242.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT XI - *MASSACHUSETTS FALSE CLAIMS ACT*

243.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

244.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Massachusetts in violation of the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5A, et seq.

245.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT XII - <em>MICHIGAN FALSE CLAIMS ACT</em>

246.     Relator incorporates by reference and re-alleges Paragraphs 1-199 as if fully set forth herein.

247.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Michigan in violation of the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.601, <u>et</u> <u>seq</u>.

248.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT XIII – <em>MINNESOTA FALSE CLAIMS ACT</em>

249.     Relator incorporates by reference and re-alleges Paragraphs 1-201 as if fully set forth herein.

250.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Minnesota in violation of the Minnesota False Claims Act, MINN. STAT. § 15C.01, <u>et</u> <u>seq</u>.

251.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT XVI - <em>MONTANA FALSE CLAIMS ACT</em>

252.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

253.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Montana in violation of the Montana False Claims Act, MONT. CODE. ANN. § 17-8-401, <u>et</u> <u>seq</u>., effective July 1, 2009.

254.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT XX - *NEVADA FALSE CLAIMS ACT*

255.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

256.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Nevada in violation of the Nevada False Claims Act, NEV. REV. STAT. § 357.010, et seq.

257.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT XXI – *NEW HAMPSHIRE FALSE CLAIMS ACT*

258.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

259.     This action is brought by Relator pursuant to the Submission of False Claims to the State of New Hampshire in violation of the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61, et seq.

260.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT XXII - *NEW JERSEY FALSE CLAIMS ACT*

261.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

262.     This action is brought by Relator pursuant to the Submission of False Claims to the State of New Jersey in violation of the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1, et seq.

263.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT XXIII - *NEW MEXICO FRAUD AGAINST TAXPAYERS ACT*</u>

264.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

265.     This action is brought by Relator pursuant to the Submission of False Claims to the State of New Mexico in violation of the New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-1, <u>et</u> <u>seq</u>.

266.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT XIX - *NEW YORK FALSE CLAIMS ACT*</u>

267.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

268.     This action is brought by Relator pursuant to the Submission of False Claims to the State of New York in violation of the New York False Claims Act, N.Y. STATE FIN. LAW, ch.13 § 187, <u>et</u> <u>seq</u>.

269.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

<u>COUNT XX – *NORTH CAROLINA FALSE CLAIMS ACT*</u>

270.     Relator incorporates by reference and re-alleges Paragraphs 1- 201 as if fully set forth herein.

271.     This action is brought by Relator pursuant to the Submission of False Claims to the State of North Carolina in violation of the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-605, <u>et</u> <u>seq</u>.

272.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT XXI - *OKLAHOMA MEDICAID FALSE CLAIMS ACT*

273.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

274.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Oklahoma in violation of the Oklahoma Medicaid False Claims Act, OKLA. STAT. TIT. 63, § 5053.1, et seq.

275.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT XXII - *TENNESSEE MEDICAID FALSE CLAIMS ACT*

276.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

277.     This action is brought by Relator pursuant to the Submission of False Claims to the State of Tennessee in violation of the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-101, et seq.

278.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT XXIII - *TEXAS MEDICAID FRAUD PREVENTION ACT*

279.     Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

280.     This action is brought by Relator for the State of Texas by reason of the Defendants' commission of unlawful acts in violation of the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE, ch.36, § 36.001, et seq.

281.     The allegations set forth herein constitute violations of this state's Medicaid Fraud Prevention Act, for which the Relator seeks the maximum award pursuant to statute.

COUNT XXIV - *STATE OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT*

282.    Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

283.    This action is brought by Relator pursuant to the Submission of False Claims to the State of Virginia in violation of the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1, et seq.

284.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

COUNT XXV - *STATE OF WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT*

285.    Relator incorporates by reference and re-alleges Paragraphs 1- 199 as if fully set forth herein.

286.    This action is brought by Relator pursuant to the Submission of False Claims to the State of Wisconsin in violation of the Wisconsin False Claims for Medical Assistance Act, WISC. STAT. § 20.901, et seq.

287.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

PRAYER

WHEREFORE, for Counts I through XXV, Plaintiffs pray for judgment against Defendants as follows:

a.    That Defendants be found to have violated and be enjoined from future violations of the California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Colorado Medicaid False Claims Act, COL. STAT. § 25.5-4-305(1), the Delaware False Claims and Reporting Act, DEL. CODE ANN. Tit. 6, § 1201, the Florida False

Claims Act, FLA. STAT. § 68.082(2), the Georgia False Medicaid Claims Act, GA. CODE ANN, § 49-4-146.1(b), Hawaii False Claims Act, HAW. REV. STAT. § 661-21, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:438.3, the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.603, the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61-b, the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-4, the New York False Claims Act, N.Y. STATE FIN. LAW, ch.13 § 189, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-607(a), the Oklahoma Medicaid False Claims Act, OKLA. STAT. TIT. 63, § 5053.1(B), the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-182, the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE, ch.36, § 36.002, the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, the Wisconsin False Claims for Medical Assistance Act, WISC. STAT. § 20.931(2).

b.  That this Court enter judgment against Defendants for the maximum amount of damages sustained by each State because of Defendant's false or fraudulent claims, plus the maximum civil penalty for each violation of the California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Colorado Medicaid False Claims Act, COL. STAT. § 25.5-4-305(1), the Delaware False Claims and Reporting Act, DEL. CODE ANN. Tit. 6, § 1201, the Florida False Claims Act, FLA. STAT. §

68.082(2), the Georgia False Medicaid Claims Act, GA. CODE ANN, § 49-4-146.1(b), Hawaii False Claims Act, HAW. REV. STAT. § 661-21, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:438.3, the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.603, the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61-b, the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-4, the New York False Claims Act, N.Y. STATE FIN. LAW, ch.13 § 189, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-607(a), the Oklahoma Medicaid False Claims Act, OKLA. STAT. TIT. 63, § 5053.1(B), the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-182, the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, the Wisconsin False Claims for Medical Assistance Act, WISC. STAT. § 20.931(2).

c.      That this Court enters judgment against Defendants in an amount equal to three times the amount of damages the Government has sustained because of Defendants' false or fraudulent claims, plus the maximum civil penalty for each violation of the various State false claims acts.

d.      That Relator be awarded the maximum amount allowed pursuant to the California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Colorado Medicaid False

73

Claims Act, COL. STAT. § 25.5-4-305(1), the Delaware False Claims and Reporting Act, DEL. CODE ANN. Tit. 6, § 1201, the Florida False Claims Act, FLA. STAT. § 68.082(2), the Georgia False Medicaid Claims Act, GA. CODE ANN, § 49-4-146.1(b), Hawaii False Claims Act, HAW. REV. STAT. § 661-21, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Indiana False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5-2, the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT.  ANN. § 46:438.3, the Massachusetts False Claims Act, MASS. GEN. LAWS ch.12, § 5(B), the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.603, the Minnesota False Claims Act, MINN. STAT. § 15C.02(a), the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61-b, the New Jersey False Claims Act, N.J. STAT. ANN. **§** 2A:32C-3, the New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-4, the New York False Claims Act, N.Y. STATE FIN. LAW, ch.13 § 189, the North Carolina False Claims Act, N.C. STAT. ART. 51, § 1-607(a), the Oklahoma Medicaid False Claims Act, OKLA. STAT. TIT. 63, § 5053.1(B), the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-182, Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE, ch.36, § 36.002, the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3, the Wisconsin False Claims for Medical Assistance Act, WISC. STAT. § 20.931(2), and all relief to which he is entitled pursuant to said laws.

e.    That Relator be awarded all costs of this action, including expert witness fees, attorneys' fees, and court costs.

f.    That Relator recovers such other relief as the Court deems just and proper.

Respectfully Submitted,

_____/s/ Timothy Keller_____
Timothy Keller
IL Bar No. 6225309
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 West
Suite 217-766
San Antonio, Texas 78257-1160
Telephone: (210) 271-3888
E-Mail: gglaw@satx.rr.com

JOHN E. CLARK
Texas Bar No. 04287000
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: Clark@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
8114 Talbot Lane
Austin, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

*Attorneys for Relator,*
*Michael Yarberry*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, TENNESSEE, TEXAS, VIRGINIA, and WISCONSIN,** *ex rel.* **MICHAEL YARBERRY,** | ) ) ) ) ) ) ) ) ) ) ) ) ) | **No.  3:09-cv-00588** |
| **Plaintiffs,** | ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| **v.** | ) ) | |
| **SEARS HOLDINGS COMPANY, INC., and KMART, INC.,** | ) ) ) ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of October 2010, I electronically filed **Plaintiff's**

**First Amended Complaint with Jury Demand** with the Clerk of Court using the CM/ECF

system which will send notification of such filings(s) to the following:

**Gerald M. Burke**
gerald.burke@usdoj.gov,sandra.carr@usdoj.gov,donna.gerdes@usdoj.gov,
USAILS.SDILCiv@usdoj.gov

and I hereby certify that on the 20th day of October 2010, I mailed by United States Postal

Service, the documents(s) to the following non-registered participants:

**State of Montana**
Attorney General
Justice Building

215 North Sanders
Helena, Montana 59620-1401

Respectfully Submitted,

/s/ Timothy Keller
Timothy Keller
IL Bar No. 6225309
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 West
Suite 217-766
San Antonio, Texas 78257-1160
Telephone (210) 271-3888
E-Mail: gglaw@satx.rr.com

JOHN E. CLARK
Texas Bar No. 04287000
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: Clark@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
8114 Talbot Lane
Austin, Texas 78746
Telephone: (512) 699-5436
E-Mail:  gmgtex@austin.rr.com

*Attorneys for Relator,*
*Michael Yarberry*