IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF CALIFORNIA, et al., ex rel. | ) | |
| MICHAEL YARBERRY, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 09-CV-588-MJR-PMF |
| | ) | |
| vs. | ) | |
| | ) | |
| SEARS HOLDINGS CORPORATION | ) | |
| and KMART, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER</u>

REAGAN, District Judge:

Pending before the Court are three motions for summary judgment. Plaintiff-Relator Michael Yarberry has filed a Motion for Summary Judgment as to all fourteen of Defendants' affirmative defenses (Docs. 147, 149), as well as a Motion for Partial Summary Judgment as to liability and damages (Doc. 151). Defendants have also filed a cross Motion for Summary Judgment as to liability and damages (Docs. 146, 148-1). For the reasons set forth below, Relator's Motion for Summary Judgment as to Defendants' affirmative defenses (Docs. 147, 149) is **GRANTED in part** and **DENIED in part**, Relator's Motion for Partial Summary Judgment as to liability and damages (Doc. 151) is **DENIED**, and Defendants Motion for Summary Judgment (Docs. 146, 148-1) is

**DENIED**. Also pending is Defendants Motion to Strike the Affidavit of Jeremy Albright offered by Relator (Doc. 168), which is **DENIED as MOOT**.[1]

### *Summary of the Relevant Facts & Procedural History*[2]

This action is brought *qui tam* by Relator Michael Yarberry ("Relator") on behalf of the United States Government.[3] Relator is a resident of Kentucky and was an employee of Defendant Kmart Corporation ("Kmart") at various times from 1992 to 1999, 2004 to 2008, and 2009 to the present (Doc. 148-1, p. 2). He is also a pharmacist in Kmart store 4180 located in Louisville, Kentucky (*Id.*).

Kmart is a wholly-owned subsidiary of Defendant Sears Holding Corporation (Doc. 148-1, p. 2). From 2005 to 2013, Kmart operated anywhere between 895 and 1,100 retail pharmacies, depending on the year (*Id.*).

Relator asserts that from approximately 2006 to the present, Defendants Sears and Kmart violated the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1) and (a)(2), as well as the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and parallel state statutes, by offering and paying monetary inducements, such as cash gift cards and/or coupon promotions, to the beneficiaries of Government Healthcare Programs ("GHPs"), including Medicare, Medicaid, TRICARE and CHAMPUS[4], in exchange for beneficiaries

---

[1] Defendants contend the affidavit should be stricken because it contains new undisclosed opinions and Albright has not provided the methodology underlying those opinions as required by FRCP 26(a)(2) (*See* Doc. 168). Since the contents of the affidavit do not impact the Court's decision (denying Relator's motion for partial summary judgment based on the existence of a genuine issue of fact as to Defendants' knowledge), the motion to strike is denied as moot.

[2] An overview of the events and basis for Relator's complaint are presented here, drawing on the parties' memoranda of law and statements of facts. More detailed facts are presented an analyzed below, in the Court's analysis of the evidence.

[3] The Government has not intervened in this action.

[4] TRICARE is a comprehensive managed healthcare program covering active members of the Uniformed Services and their dependents. CHAMPUS is the Civilian Health and Medical Program of the Uniformed Services, the

filling their prescriptions at Defendants' pharmacies.

Three separate Kmart promotions are at issue in this case: (1) coupons redeemable for gift cards, (2) OTG cards, and (3) the SYWR loyalty program. First, Kmart issued coupons that could be redeemed by non-GHP beneficiaries for gift cards in exchange for filling a new or transferred prescription at Kmart. For example, in 2009, Kmart implemented a program called "Smart Squad" in which cashiers in the front of the store distributed brochures containing four coupons to customers (Doc. 148-1, p. 3). Each Smart Squad coupon could be redeemed for a $25 gift card when a customer filled a new or transferred prescription at a Kmart pharmacy (*Id*.). Kmart employees could earn a $25 or $50 gift card if their store filled 100 such prescriptions during the Smart Squad promotion (*Id*., p. 6). Like most of these coupons redeemable for gift card promotions, GHP beneficiaries were <u>not</u> eligible for the Smart Squad promotion (*Id*., p. 7). Kmart ran four of these Smart Squad promotions from 2009 through 2010 (Doc. 150, p. 7-8).

Second, Kmart issued "On Time Guarantee" ("OTG") cards, which involved either a $10 or $20 gift card that pharmacists could give to a customer if their prescription was not ready when promised, if it could only be partially filled, or if a requested drug was not available (Doc. 148-1, p. 3). Pharmacists were permitted to give an OTG card to a GHP beneficiary in the event of an isolated customer service issue (*Id*.).

Third, Kmart had a "Shop Your Way Rewards" ("SYWR") loyalty program. Customers needed to enroll in this program, and by doing so, they would earn 10 points

---

benefits program for former military personnel.

for every $1 spent on purchases at Sears, Kmart, and/or their affiliated operations (*Id*.).

SYWR could redeem these points for certain qualifying purchases at the rate of

approximately $1 for every 1,000 points (*Id*.). These points are awarded after the

transaction to be used at a later date (Doc. 192, p. 2). On September 24, 2010, SYWR was

launched in Kmart pharmacies by allowing pharmacy customers to earn 500 base points

(worth approximately 50 cents) with the purchase of a prescription at Kmart (Doc. 148-1,

p. 7). These points could not be redeemed for prescription purchases (*Id*.). Kmart

initially permitted GHP beneficiaries to earn SYWR points for prescription purchases

(*Id*., p. 8). On March 27, 2011, however, Kmart pharmacies suspended the use of gift

cards, coupons, and OTG cards on all prescription purchases and GHP beneficiaries

were foreclosed from earning SYWR points on prescription purchases (*Id*.). SYWR

members who are also GHP beneficiaries are still excluded from earning SYWR points

on prescription purchases today (*Id*.).

All Kmart coupons that related to pharmacy transactions expressly stated that

they were "not valid . . . on prescriptions paid in whole or in party by any government

programs." (Doc. 148-1, p. 4, Doc. 176, p. 3, Doc. 150, p. 3). Kmart's Pharmacy Coupon

Policy also provided that coupon "[o]ffer[s] [are] not valid on prescriptions paid for in

whole or in part by any government programs." (*Id*.). Citing to the Anti-Kickback

Statute ("AKS") 42 U.S.C. § 1320a-7b(b), this Policy also stated:

> [T]he pharmacist should not knowingly allow a Medicare or Medicaid beneficiary
> to receive a gift card for a transferred or new prescription. Medicare/Medicaid
> patients who are not using their Medicare or Medicaid benefits to pay for the
> specific prescription being filled must not be offered or provided a gift card. Gift

cards should not be knowingly offered to CHAMPUS and TRICARE beneficiaries or to any beneficiaries of federal health care entities.

Kmart pharmacy personnel were aware that GHP beneficiaries could not redeem coupons for gift cards (Doc. 150, p. 4). Although GHP beneficiaries were not permitted to receive these gift cards, they still received them. Specifically, between November 2007 and May 2013, Kmart filled approximately 60,063,090 prescriptions that may have been paid for by a GHP beneficiary (Doc. 150, p. 12). Kmart issued 76,011 gift cards in the same transaction as a purchase of a prescription drug by a GHP beneficiary (Doc. 150, p. 13). In November 2009, Kmart developed an automatic flag system, which allowed pharmacists to identify a GHP beneficiary who was ineligible for a gift card or coupon (Doc. 148-1, p. 4). The parties dispute whether this was only one of the means available to identify a GHP beneficiary who was ineligible for a gift card or whether it was the *only* means available (Doc. 176, p. 3-13, Doc. 150, p. 6). This system was created by Kmart's then Pharmacy Project Manager, Mistee Budrovic, by compiling a list of government healthcare plans, including their plan codes and carrier codes (*Id*.).[5] This list was titled as the "Insurance Plans by Category" list (*Id*.). Kmart then used this list to create an interface between its PDX and POS systems[6] to cross-reference plan codes and carrier codes (Doc. 148-1, p. 4). This interface allowed the POS cash register system to electronically "flag" pharmacy customers that were GHP beneficiaries, thus preventing

---

[5] This list was created in the PDX system (which is a software platform Kmart uses for its prescription dispensing and billing system). The plan and carrier codes in PDX are each three-letter codes that Kmart assigns when an insurance payor is input into Kmart's PDX system (Doc. 148-1, p. 4).
[6] The POS system is Kmart's cash register system. All gift cards or coupons must be scanned into the POS system (*Id*.). The POS system and PDX system are the two software systems used by Kmart to process prescription purchases (*Id*.).

a gift card or coupon from being scanned with their prescription transaction (which the parties refer to as the "Automatic Flag") (*Id*). This went into effect in all Kmart pharmacies on November 2, 2009 (*Id.*).

This case has generated a lengthy procedural history, which is only briefly summarized here. Relator filed a Complaint (Doc. 2) on August 3, 2009, a First Amended Complaint (Doc. 26) on January 18, 2011, a Second Amended Complaint (Doc. 69) on July 6, 2012, and the operative Third Amended Complaint (Doc. 133) on June 11, 2013. Defendants filed an Answer (Doc. 134) to the Third Amended Complaint on June 27, 2013. Additionally, the parties filed various other pleadings and numerous motions and conducted extensive discovery. As previously stated, there are three motions for summary judgment pending, all of which are now ripe for adjudication.

## *Legal Standard*

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial.… A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, **246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted).**

The Court neither weighs evidence nor resolves material factual issues, but only determines whether, after adequate discovery, any such issues remain unresolved because a reasonable fact finder could decide for either party. *See Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).**

*Analysis*

## I.     The Interplay of the False Claims Act and the Anti-Kickback Statute

The False Claims Act ("FCA") "broadly . . . protect[s] the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the Government instrumentality upon which said claims were made." *Rainwater v. United States*, **356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1959)**.   In enacting the FCA, Congress intended "'to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County, Illinois v. United States ex rel. Chandler*, **538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968))**.

Under Subsection (a)(1) of the False Claims Act ("FCA")[7], a person is prohibited from "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of

---

[7] It should be noted that the FCA, 31 U.S.C. § 3729, was amended during the time period relevant to this action. *See* **Pub.L. No. 111-21, 123 Stat. 1617 (May 20, 2009)**.   In particular, the standard of liability was changed.   The FCA previously imposed liability for "knowingly mak[ing] . . . a false record or statement to get a false or fraudulent claim paid or approved by the Government," **31 U.S.C. § 3729(a)(2) (2006)**.   Now, the amended liability standard imposes liability for "knowingly mak[ing] . . . a false record or statement material to a false or fraudulent claim." **31 U.S.C. § 3729(a)(1)(B) (2012)**.   For reasons explained on pages 17-18 of this Order, the Court will primarily cite to the 2006 version of the FCA.

the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." **31 U.S.C. § 3729(a)(1) (FCA pre-2009 Amendments)**.

Subsection (a)(2) prohibits a person from knowingly making a false record or statement to get a false or fraudulent claim paid or approved by the government. **31 U.S.C. § 3729(a)(2) (FCA pre-2009 Amendments)**. The three elements of this claim are: "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (quoting *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005))*.[8]

The FCA states that:

The terms "knowing" and "knowingly" mean that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.

**31 U.S.C. § 3729(b) (FCA pre-2009 Amendments)**.

Compliance with the AKS is a condition of reimbursement from Medicare programs, and a violation of the AKS is sufficient to state a claim under the False Claims Act. *See **U.S. ex rel. Health Dimensions Rehabilitation, Inc. v. RehabCare Group, Inc.**, No. 12-cv-00848, 2013 WL 4666338, at * 4 (E.D.Mo. Aug. 30, 2013); United States ex rel.*

---

[8] The Court will not proceed to outline the elements of 31 U.S.C. § 3729(a)(7), known as the "reverse false claim," as Relator indicated in his response that he is abandoning this claim (*See* Doc. 176, p. 14).

*Kosenske v. Carlisle HMA, Inc.*, **554 F.3d 88, 94 (3d Cir. 2009)**; *United States v. Omnicare, Inc.*, **No. 07 C 05777, 2013 WL 3819671, at \*9 (N.D.Ill. July 23, 2013)**.   Thus, a claim that includes items or services resulting from a violation of [the AKS] constitutes a false of fraudulent claim for purposes of [the FCA]."   **42 U.S.C. § 1320a-7b(g)**.   The AKS provides that:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

> **42 U.S.C. § 1320a-7b(b)(2)(A)-(B).**

## II.     Relator's Motion for Summary Judgment as to Defendants' Affirmative Defenses (Docs. 147, 149)

Relator contends that his summary judgment motion should be granted with respect to all fourteen of Defendants' affirmative defenses.   Federal Rules of Civil Procedure 8(c) requires affirmative defenses to be raised in the pleadings.   **FED. R. CIV. P. 8(c)**; *Curtis v. Timberlake*, **436 F.3d 709, 711 (7th Cir. 2005)**.   An affirmative defense is to be litigated at summary judgment or at trial.   *Marshall v. Knight*, **445 F.3d 965, 969 n. 2 (7th Cir. 2006)**.   "Ordinarily, defenses will not be struck if they are sufficient as a matter of law or if they present questions of law or fact."   *Heller Fin., Inc. v. Midwhey Powder Co.*, **883 F.2d 1286, 1294 (7th Cir. 1989)**.   Defendants must "state in short and plain terms its defenses to each claim asserted against it[.]"   **FED. R. CIV. P. 8(b)**; *Heller*

*Fin. Inc.*, **883 F.2d at 1294**.

### A. First Affirmative Defense- Failure to State a claim

Defendants asserted fourteen affirmative defenses along with their Answer (Doc. 134). The first defense is that Relator has failed to state a claim upon which relief may be granted. The Court rejected Defendants' Rule 12(b)(6) argument in its March 28, 2013 Order when it denied Defendants Motion to Dismiss all sixteen counts of the complaint (*See* Doc. 113). In that Order, the Court found that the complaint stated enough facts to state a claim to relief that is plausible on its face. Relator is entitled to summary judgment on this defense.

### B. Second and Third Affirmative Defenses- *De Minimis* Exception for Gift Cards and SYWR Points

The second and third affirmative defenses assert that the gift cards and/or SYWR points that Defendants may have awarded to GHP beneficiaries were "*de minimis*" as that term is defined in the federal regulations and therefore do not constitute a "remuneration" under the AKS. Relator asserts that the law of the case doctrine precludes Defendants from re-arguing these affirmative defenses. The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." ***Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)**. While the Court fully respects the law of the case doctrine and the purpose it is intended to serve, it does not apply in this instance. As Defendants point out, a court's decision constitutes the

law of the case only if the court *actually decided* the issue, either expressly or by necessary implication. ***See PaineWebber, Inc. v. Farnam*, 870 F.2d 1286, 1291 (7th Cir. 1989)**. If an issue was not decided in actuality or by implication, then the prior ruling does not constitute the law of the case in the later proceeding. ***Id.***

Here, when the undersigned District Judge denied Defendants' motion to dismiss, the *de minimis* exception argument was briefly discussed in one paragraph out of the Court's fourteen page Order (*See* Doc. 113, p. 10). In dismissing the argument, the undersigned noted that "Defendants citations are far from clear and the Court need not do Defendants research for them" (Doc. 113, p. 10). Thus, the Court has not technically decided, explicitly or implicitly, whether the *de minimis* exception applies to the gift cards and SYWR points. Accordingly, the Court will consider this issue.

Defendants contend that the allegedly nominal inducements purportedly involved in this action – valued at $10 or less- fall within a safe harbor that permits "*de minimis* gifts to GHP beneficiaries of less than $10 in value." (Doc. 148-1, p. 15-16).[9] Specifically, Defendants urge the Court to apply the definition of "remuneration" as it is defined in the Civil Monetary Penalties Statute ("CMP"), including the relevant exceptions.

Congress introduced the broad term "remuneration" in the 1977 amendment of the statute to clarify the types of financial arrangements and conduct to be classified as illegal under Medicare and Medicaid. **H.R.Rep. No. 95-393, Pt. II, 95th Cong., 1st Sess.**

---

[9] The Court cites to this argument as contained within Defendants' Motion for Summary Judgment because the argument is more thoroughly developed in this brief.

**53** *reprinted in* **1977 U.S.C.C.A.N. 3039, 3056**.   The phrase "any remuneration" was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates.   The parties dispute whether the Civil Monetary Penalties Statute ("CMP") definition of "remuneration" applies here.

The AKS provides that the prohibitions of the AKS shall not apply to "any payment practice specified by the Secretary [of Health and Human Services ("HHS") ] in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987 or in regulations under section 1395w–104(e)(6) of this title."   **42 U.S.C. § 1320a–7b(b)(3)(E)**.   The Secretary, through the HHS Office of Inspector General ("OIG") and CMS, has created (or has offered guidance with respect to) a number of regulatory safe harbors that Defendants claim are applicable to this case. Most notably, the OIG has interpreted the prohibition against the offering of remuneration to prospective Medicare enrollees, discussed below, as not applying to inexpensive gifts or services (i.e. gifts of "nominal value") that have a value of $10 individually or $50 in the aggregate annually, per patient.   *See* **OIG Special Advisory Bulletin, Offering Gifts and Other Inducements to Beneficiaries (August 2002)**.

Equally notable is the fact that this Advisory Bulletin (as well as the MEDICARE MARKETING GUIDELINES § 70.3 cited by Defendants, which cite to 42 CFR § 422.2268, 423.2268) specifically states that that these inexpensive gifts exclude cash or cash equivalents.   *Id.; see also* **Centers for Medicare & Medicaid Services, 42 C.F.R. § 422.2268, 423.2268 (may offer gifts to potential enrollees if they "are not in the form of**

**cash or other monetary rebates"**).   The gift cards that Kmart provided were essentially cash cards that could be used to purchase items at Kmart's stores (*See* Doc. 150, p. 6-7). The SYWR points were also a cash equivalent, as they were redeemable at the rate of approximately $1 for every 1,000 points (*See* Doc. 150, p. 9).   Thus, even if the Court were to find that the CMP definition of "remuneration" should apply here[10], the gift cards and SYWR points would not fall within the $10 *de minimis* exception as the Court considers them to be cash equivalents or a type of monetary rebate.   Relator is entitled to summary judgment as to these affirmative defenses.

### C.  Fourth Affirmative Defense- Lack of Intent Due to Reasonable Reliance on Government Issuances

Defendants Fourth Affirmative Defense argues that they lacked intent to violate the AKS because they relied upon a HHS-OIG advisory opinion.   This affirmative defense relates to Defendants' state of mind only as to one of the three promotions, the SYWR program.   Defendants assert that they "reasonably believed that the SYWR program was substantially similar to the program addressed in the Advisory Opinion and thus, also reasonably believed that GHP beneficiaries could participate in this program." (Doc. 134, p. 67).   The Advisory Opinion that Defendants allegedly relied on is HHS-OIG Adv. Op. No. 07-09 (Doc. 149-1).   Materials that may otherwise be inadmissible may be admitted as evidence of a party's intent or state of mind.   *See* **FED. R. EVID. 404, 803**.   Thus, the Court will allow the introduction of this advisory opinion for the limited purpose of arguing Defendants' intent or state of mind.   As the Court

---

[10] There does not appear to be any controlling authority on point as to whether CMP's safe harbors apply to an FCA lawsuit such as this one that is predicated upon an AKS violation.

fully explains below, this evidence, along with other evidence presented to the Court relating to whether Defendants knowing and willfully allowed GHP beneficiaries to participate in the SYWR program, is for a jury to weigh.

### D. Fifth Affirmative Defense- Claims not "Paid by the Government"

Defendants Fifth Affirmative Defense asserts that Defendants have neither submitted nor caused to be submitted, within the meaning of the False Claims Act, certain Medicare Part D claims. Specifically, Relator asserts that Kmart admitted that it has received federal funds for *all* of its GHP beneficiary prescription reimbursement claims, so the claims were obviously presented to the government. Defendants, on the other hand, assert that this fact remains disputed, citing its request for admission (Doc. 138) that specifically denies that every transaction involving a GHP beneficiary and an inducement was paid using Federal government funds. Defendants focus this affirmative defense to a particular group of Medicare Part D beneficiaries that purchased a prescription and received a gift card but Kmart did not receive any federal funds in connection with this prescription purchase. Defendants cite to Relator's data analyst expert, Jeremy Albright, who indicates that there were certain transactions where a Medicare Part D customer received a gift card but Kmart did not actually receive money from the government (Doc. 174-1). Because it appears to the Court there exists an issue of fact as to these specific Medicare Part D beneficiaries, Relator is not entitled to summary judgment as to this defense.

### E. Sixth and Seventh Affirmative Defenses- Unconstitutionality of Damages & Penalties (8th Amendment & 5th Amendment)

Defendants assert in their Sixth and Seventh affirmative defenses that the treble damages and civil penalties that Relator seeks would violate the United States Constitution, namely the Eight and Fifth Amendments. The Court finds this inquiry to be premature unless and until a jury returns a verdict for damages, not to mention liability. Therefore, Relator is not entitled to summary judgment as to these affirmative defenses at this juncture.

**F. Eighth and Ninth Affirmative Defenses- Statute of Limitations**

Defendants eighth and ninth affirmative defenses are based on the FCA statute of limitations, which establishes that a claim may not be brought:

> (1) More than 6 years after the date on which the violation . . . is committed; (2) or more than 3 years after the date when facts material to the right of action are known or reasonably should have known by the official of the United States charged with the responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

**31 U.S.C. § 3731(b)**. Here, there is no valid statute of limitations defense. Relator filed suit in August 2009 (Doc. 2) and seeks damages for conduct from January 1, 2006 forward. Relator filed suit well within the six year period. Defendants indicate in their response that they agree that Relator's complaint falls within the statute of limitations for the federal claims, as well as the state claims referenced in Counts II-XIV, and moves to withdraw the eighth and ninth affirmative defenses (Doc. 174, p. 3, FN 2). Accordingly, the Court grants this request and considers these affirmative defenses to be withdrawn.

### G. Tenth and Eleventh Affirmative Defenses- Public Disclosure and Original Source

Defendants' tenth and eleventh affirmative defenses assert that any fraud was based on publicly available information, and therefore barred, and Relator is not an original source of the information as required by the FCA. These arguments were explicitly considered and previously rejected by this Court in its March 28, 2013 Order when it denied Defendants Motion to Dismiss all sixteen counts of the complaint (*See* Doc. 113). As to the Defendants' tenth affirmative defense, the Court held, after conducting a thorough analysis, that "Relator correctly observes that the fraudulent conduct was never in the public domain; the fraud could not be inferred from the information that was public." (Doc. 113, p. 13). As to Defendants eleventh affirmative defense, the Court held that "[b]ecause there was no public disclosure for purposes of Section 3730(e)(4)(A), whether Relator Yarberry qualifies as an original source is irrelevant." (Doc. 113, p. 13). In Defendants response to Relator's Motion, they withdraw their Tenth and Eleventh Affirmative Defenses (*See* Doc. 174, FN 3). Accordingly, the Court finds these motions to be withdrawn on the motion of Defendants.

### H. Twelfth Affirmative Defense- Unconstitutionality of the Retroactive Application of FERA 2009

Defendants assert that the 2009 amendments to the FCA, in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617, cannot be applied retroactively to Relator's claims. As the Court previously noted in its

March 28, 2013 Order, and footnote 6 in this Order, the FCA was amended during the time period relevant to this action, and these amendments were "Clarifications to the False Claims Act to Reflect the Original Intent of the Law, " intended to "clarify and correct erroneous interpretations of the law." **Pub.L. No. 111-21, § 4, 123 Stat. 1617, 1621-25;** *Sanders v. Allison Engine Co., Inc.,* **703 F.3d 930, 934 (6th Cir. 2012)**.    The Court has already indicated its intention to cite to the 2006 version of the FCA.    However, the parties dispute whether the particular section of 3729(a)(1)(B), as amended, should apply to this case.    The previous version, codified at 31 U.S.C. § 3729(a)(2), imposed liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." **31 U.S.C. § 3729(a)(2) (FCA Pre-2009 Amendments)**.    As amended, the statute imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." **31 U.S.C. § 3729(a)(1)(B) (current version).**

FERA provided that the amendment to this particular provision "shall take effect as if enacted on June 7, 2008, and apply to all *claims* under the False Claims Act that are pending on or after that date." **Pub. L. No. 111-21 (emphasis added)**.    The Seventh Circuit has stated in a footnote that section 3729(a)(1)(B) applies to *cases* that were pending on or after June 7, 2008.    *See* ***U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822, n. 2 (7th Cir. 2011)**.    Thus, Relator asserts that the amended version of the statute applies in this case, which has been pending since August 2009.

Defendants respond that "claims" under FERA refer to requests for reimbursement, not lawsuits. The FCA defines the term as "any request or demand . . . for money or property." **31 U.S.C. § 3729(b)(2)(A); 31 U.S.C. § 3729(c)**. Thus, Defendants assert that the amendment cannot apply to Relator's entire lawsuit. Defendants argue that the *Yannacopouos* footnote is merely dicta and the court "did not directly address the retroactive application of FERA" nor did it distinguish between "claims" and "cases" to "indicate that it disagreed with prior cases actually analyzing the retroactivity of FERA" (Doc. 174, p. 17).

The Court agrees that *Yannacopoulos* does not establish binding precedent on this question, as the question of whether FERA amendments applied was not at issue in that case. Further, the court in *Yannacopouos* did not distinguish between "claims" and "cases," and the Court finds the two terms to be different. Particularly, the Court agrees with Defendants that "claims" as mentioned in FERA are not a reference to lawsuits. **See *U.S. ex rel. Hudalla v. Walsh Const. Co.*, 834 F.Supp.2d 816, 828-829 (N.D. Ill. 2011) (citing *Mason v. Medline Indus., Inc.*, 731 F.Supp.2d 730, 734 (N.D. Ill. 2010) (finding that the FCA clearly defines "claim" in a manner that does not include "legal claim"))**. Further, the Court agrees with the Northern District in *Hudalla* when the court reasoned that if Congress intended the retroactivity of § 4(f)(1) of FERA (Pub.L. No. 111-21, 123 Stat. 1625) be measured by "cases," it would have said so just as it did in § 4(f)(2). **See *Hudalla*, 834 F.Supp.2d at 829**. Thus, the Court concludes that the amended version of 31 U.S.C. § 3729(a)(1)(B) does not apply in this case, and the Court

will instead apply the pre-FERA version of the FCA.

## I.  Thirteenth Affirmative Defense- *De Minimis* Error Rate Exception

Defendants assert that their error rates were within the accepted norm and therefore, the requisite *mens rea* to support a violation of the AKS or the FCA is absent. Specifically, Defendants assert that less than 0.13% of all prescriptions sold to GHP beneficiaries involved an inducement, which falls well below the Government's generally accepted error rate of 3-5%.[11]   Although Defendants have submitted evidence in support of this 0.13% error rate (*See* Doc. 148-1), the Court questions whether the date range provides for the most accurate calculation in light of the fact that the flagging system was implemented in November 2009.   Had a different date range been chosen, a different conclusion could have resulted.   Nonetheless, the Court will not grant summary judgment as to this defense at this juncture.

## J.  Fourteenth Affirmative Defense- Temporal and Related Limitation

Defendants also assert that Relator has failed to state a claim with respect to any alleged violation of the Anti-Kickback Statute and/or the False Claims Act that involves a purchase of a drug by a GHP beneficiary that is not part of the transaction awarding a gift card or points that occurred on a subsequent day, week, month or year.   This affirmative defense essentially requests a temporal limitation on the false claims to be presented in this matter.   Relator is correct when he asserts that Magistrate Judge Frazier has already accomplished this in his discovery ruling when he defined a claim as

---

[11] Defendants assert that Medicare's acceptable error rate is 3-5%, citing *Medicare Compliance Review of the Fee for Services Billing Program for Sonoma Developmental Center* at 3; *OIG Open Letter to Health Care Providers, Office of Inspector General* (Nov. 20, 2001), and *Maryland v. Mathews*, 415 F. Supp. 1206 (D.D.C. 1976).

"an inducement delivered to a person who can be identified as a person who received government health benefits who then acts on the inducement on a specific date and that action leads to a claim made by K-Mart/Sears to the government." (Doc. 148). The undersigned District Judge affirmed this ruling on May 2, 2013 (Doc. 125, p. 7-9). Accordingly, Relator is entitled to summary judgment as to this affirmative defense.

### III.    Defendants' Motion for Summary Judgment (Doc. 148-1)

The difficult question regarding Defendants' False Claims Act and AKA liability is whether Defendants acted *knowingly or willfully*.   Defendants argue that there is simply no evidence in the record indicating that Kmart knowingly or willfully issued coupons or gift cards to GHP beneficiaries.   Relator argues to the direct contrary, that Kmart knew it was prohibited from offering gift cards to GHP beneficiaries, but nevertheless did so more than 76,000 times, and knowingly withheld tools that would have prevented GHP beneficiaries from exchanging the coupons that Kmart gave them for gift cards.

The FCA defines the terms "knowing" and "knowingly," which mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.   *See* **31 U.S.C.S. § 3729(b)(1)-(3).** Therefore, while "[i]nnocent mistakes or negligence are not actionable under [the FCA]" the statute does not require proof of specific intent to defraud is required.   **§ 3729(b);** *see also United States ex rel. Yannacopoulos v. Gen. Dynamics***, 652 F.3d 818, 832 (7th Cir.**

**2011)**.

The "knowingly" element of an FCA claim provides the requisite degree of scienter and carries forth Congress's intent that the FCA does not punish "'honest mistakes or incorrect claims submitted through mere negligence.'" *United States ex rel. Hochman v. Nackman,* **145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S.Rep. No. 99-345, at 7 (1986),** *reprinted in* **1986 U.S.C.C.A.N. 5266, 5272);** *see also U.S. v. King-Vassel,* **728 F.3d 707, 712 (7th Cir. 2013)**.   At the same time, however, the definition of "knowingly" reaches "'what has become known as the "ostrich" type situation where an individual has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.'" *United States v. Bourseau,* **531 F.3d 1159, 1168 (9th Cir. 2008) (quoting S.Rep. No. 99-345, at 21 (1986),** *reprinted in* **1986 U.S.C.C.A.N. 5266, 5286)**.   With § 3729, Congress thus "adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.'" *Id.* "While the Committee intends that at least some inquiry be made, the inquiry need only be 'reasonable and prudent under the circumstances.'" *Id.; see also Heckler v. Cmty. Health Servs. of Crawford County, Inc.,* **467 U.S. 51, 63-64, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law.... As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement.");** *Bourseau,* **531 F.3d at 1168;** *Mackby,* **261 F.3d at 828;**

*King-Vassel*, 728 F.3d at 713.

Here, it is undisputed that Kmart knew that it was a violation of the AKS and FCA to offer remuneration to GHP beneficiaries (Doc. 148-1, p. 2-3). In fact, all of Kmart's coupons that related to pharmacy transactions expressly stated that they were "not valid . . . on prescriptions paid in whole or in party by any government programs." (Doc. 148-1, p. 2). Kmart's Pharmacy Coupon Policy also provided, citing the AKS, that:

> [T]he pharmacist should not knowingly allow a Medicare or Medicaid beneficiary to receive a gift card for a transferred or new prescription. Medicare/Medicaid patients who are *not* using their Medicare or Medicaid benefits to pay for the specific prescription being filled must not be offered or provided a gift card. Gift cards should not be knowingly offered to CHAMPUS and TRICARE beneficiaries or to any beneficiaries of federal health care entities.

Kmart also admits that it did issue gift cards on 76,011 occasions to GHP beneficiaries (Doc. 150, p. 13). Kmart stresses that it did not *know* it was engaging in this misconduct and asserts that nothing in the record indicates otherwise.

Relator has come forth with evidence that Kmart had all of the information necessary to prevent GHP beneficiaries from receiving gift cards, and yet it elected not to conduct such investigation prior to issuing gift cards. Thus, Relator argues, that Kmart's failure to take reasonable steps to preclude GHP beneficiaries from receiving gift cards amounted to knowing and willful conduct. Kmart, however, asserts that it had taken steps necessary to prevent GHP beneficiaries from receiving gift cards, such as making this information available to Kmart pharmacists.

In November of 2009, Kmart implemented an automatic flag system, which

allowed pharmacists to identify a GHP beneficiary who was ineligible for a gift card by automatically cross-referencing plan codes and carrier codes to intercept these beneficiaries. Prior to the implementation of this flagging system, Kmart asserts that there were several ways that Kmart pharmacists could determine whether a customer was a GHP beneficiary (Doc. 148-1, p. 3; Doc. 150, p. 4-5). This included: looking at the plan name field in Kmart's PDX pharmacy dispensing system; looking at the customer's insurance card (because many referenced Medicare Part D); looking at the co-pay (low co-pays indicated Medicaid and Medicare patients) and looking at the plan numbers (*Id.*).

Relator, however, directly disputes this with supporting declarations and deposition testimony of Kmart pharmacists who indicate that they had no way to reliably identify GHP beneficiaries (Doc. 176, p. 5). For example, Melissa Hudson, a Kmart pharmacist, testified that "[b]efore Kmart installed the hard halt/automatic flag at my store in 2009, we had no way to reliably identify GHP beneficiaries" (Doc. 176-2). Theresa Hockenbury, also a Kmart pharmacist, testified that "figuring out who had a government health plan and which plans couldn't get coupons was very confusing." (Doc. 176-1, p. 2). Thus, there is an obvious disputed issue of fact as to whether employees could reliably identify GHP beneficiaries.

After Medicare Part D became effective in 2006, "the number of Medicare insurance plans and GHP beneficiaries shopping in Kmart pharmacies increased significantly." (Doc. 150, p. 5, Doc. 148-1, p. 3). Relator contends that Kmart

indiscriminately promoted these pharmacy coupon programs to *all* customers including GHP beneficiaries, and it reaped huge financial benefits from those promotions (Doc. 176, p. 20). For example, Relator has set forth evidence, via testimony of pharmacist Hockenbury, that "[c]orporate and district management expected us to cheerfully accept coupons, we were encouraged to honor as many new and transfer prescription coupons as possible. We were praised for giving out lots of gift cards, and the stores that had the highest volume were singled out on reports during these promotions." (Doc. 176-1, p. 2). Further, employees "were told to make [the customers] happy. This included being told to give OTG cards to customers with [GHP] insurance if we couldn't give them gift cards and they were unhappy about it." (*Id*.). Michael Lin, a former pharmacist at Kmart, stated in his sworn affidavit that "anyone could get Kmart's new and transfer prescription coupons…" and "Kmart absolutely encouraged its staff to honor as many new and transfer prescription coupons as possible." (Doc. 176-3, p. 2).

Given the evidence adduced, it is apparent to the Court that genuine issues of facts exist as to whether Defendants acted knowingly or in a reckless disregard as to the falsity of its claims. If it is true that Kmart did have all the information it needed to identify GHP beneficiaries for its pharmacy employees, but failed to have an adequate system in place that allowed them to identify these beneficiaries, then this may be sufficiently reckless to yield False Claims Act liability. ***See United States v. Raymond & Whitcomb Co*., 53 F.Supp.2d 436, 447 (S.D.N.Y 1999) ("failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield**

False Claims liability"); *See also United States v. Krizek*, **111 F.3d 934 (D.C. Cir. 1997)** **(holding that psychiatrist and wife acted with reckless disregard in submitting incorrect billings where wife made implausibly high volume of submissions and psychiatrist failed to review the submissions)**.   The evidence presented to the Court, however, is in dispute and cannot compel such a conclusion.   Thus, it is up to the jury to determine whether Defendants "had at least a reckless disregard for the falsity of its claims."   *United States ex rel. Compton v. Midwest Specialties, Inc.*, **142 F.3d 296 (6th Cir. 1998)**.   Accordingly, Defendants motion for summary judgment is denied.

IV.    **Relator's Motion for Partial Summary Judgment as to Liability and Damages (Doc. 151)**

Along those same lines, Relator's evidence as presented to the Court is sufficient only to allow, not to compel, a reasonable fact finder to conclude that Defendants acted "knowingly" within the meaning of the FCA.   If it is found that Defendants did not take sufficient precautions to detect GHP beneficiaries until November 2009, when the flag program was implemented, a reasonable fact finder could conclude that Defendants acted unjustifiably and negligently, but not recklessly or in deliberate ignorance.   Such a finding would be insufficient for FCA and AKS liability.   *See United States ex rel. Hagood v. Sonoma County Water Agency*, **929 F.2d 1416, 1421 (9th Cir. 1991) ("The statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard'")**.   The Court must be mindful of the basic rule that a defendant's state of mind typically should not be decided on summary judgment.   *See Hunt v. Cromartie,*

**526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)**.   Overall, the import of the above-mentioned statements, actions and inactions relating to whether Kmart knowingly and willfully violated the AKA and False Claims Act are for a jury to weigh and the Court need not go further.   Accordingly, Relator's motion for partial summary judgment (Doc. 151) is **DENIED**.

*Conclusion*

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Relator's Motion for Summary Judgment as to Defendants' affirmative defenses (Docs. 147, 149), **DENIES** Relator's Motion for Partial Summary Judgment as to liability and damages (Doc. 151), and **DENIES** Defendants Motion for Summary Judgment (Docs. 146, 148-1).   Finally, the Court **DENIES as moot** Defendants motion to strike the affidavit of Jeremy Albright offered by Relator (Doc. 168).

**IT IS SO ORDERED.**

**DATED:**   November 20, 2013

s/Michael J. Reagan _____
MICHAEL J. REAGAN
United States District Judge
