1

```
                      UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF ILLINOIS


UNITED STATES of AMERICA  )
ex rel,                   )      09-588
                          )
                          )
            Plaintiffs,   )
                          )
        Vs.               )      East St. Louis, Illinois
                          )      November 15, 2013
SEARS HOLDINGS            )
CORPORATIONS, et al.,     )
                          )
            Defendants,   )

                  TRANSCRIPT OF MOTIONS HEARING,
            BEFORE THE HONORABLE MICHAEL J. REAGAN,
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:       Assistant U.S. Attorney
                          By:  Gerald M. Burke
                          9 Executive Drive
                          Fairview Heights, IL  62208

                          Helmer, Martins, et al.,
                          By:  Paul B. Martins
                          600 Vine Street, Suite 2704
                          Cincinnati, OH  45202

For the Defendants:       Greenberg, Traurig
                          By:  Kimberly M. DeShano
                          77 West Wacker Dr.
                          Chicago, IL  60601

Court Reporter:           Barbara Kniepmann
                          750 Missouri Avenue
                          East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

2

1      (Whereupon the following proceedings were held in open

2  Court.)

3          THE COURT:  Good afternoon all.  Please be seated.

4  Okay, the United States of America, ex rel, Michael Yarberry,

5  Plaintiffs, against Sears Holding Corporation and K-Mart

6  Corporation, 09-588.

7          Today I set for argument Document 145 which was filed

8  August 23rd of 2013 and is entitled Motion to Exclude Jeremy

9  J. Albright As An Expert Witness.  The plaintiffs responded at

10  Document 169 on September 26th and the defendants replied at

11  Document 180 on October 10th.  So on behalf of the defense,

12  whoever would like to argue, please come forward.  As long as

13  I can hear you, you can stand, sit, whatever.  I would ask as

14  you each speak to identify yourselves so we get the correct

15  attribution on the record.

16          MS. DeSHANO:  Good afternoon.  Kimberly DeShano from

17  Greenberg Traurig for the defendants.

18          Your Honor, I want to clarify from the beginning,

19  although our motion is entitled Motion to Exclude Dr.

20  Albright, in reality we're not excluding Dr. Albright's

21  testimony.  What we're seeking is that his testimony not be

22  presented under Federal Rule of Evidence 702 as an expert.

23  Dr. Albright is and has been represented throughout this case

24  as being a data analyst and he can testify as to his analysis

25  of defendant's data as a summary witness under Evidence Rule

1   1006.  He does not need to be, nor does he qualify as an

2   expert under Rule 702.

3          As I am sure Your Honor is aware, Rule 702 permits a

4   witness who is qualified by certain knowledge, skill or

5   experience to testify in the form of an opinion or otherwise.

6   Everyone has acknowledged, and I think plaintiffs acknowledge

7   in their paper that Dr. Albright is not presenting any

8   opinions here.  That was indicated in the very first letter

9   accompanying his report, in his first report, which is now

10  approximately a year old and in his deposition, all of which

11  were cited in our motion.

12         Plaintiff is claiming that Dr. Albright is going to

13  testify under the "otherwise" prong of Rule 702 and that prong

14  has been defined by the Advisory Committee Notes as

15  dissertation or exposition of scientific or other principles

16  relevant to the case, leaving the trier of fact to apply those

17  principles to the facts.  Plaintiff states that Dr. Albright's

18  technical knowledge that he is going to be exposing to the

19  jury is the knowledge of the databases that defendants

20  produced and in selecting the software that he used to combine

21  the databases that defendants produced.

22         There is no question here about how the data that was

23  provided has been integrated.  In fact, the integration that

24  Dr. Albright initially did is really not at issue at all

25  because since then defendants have done their own integration

4

1   and produced it to the plaintiffs and the parties have agreed

2   -- in fact, defendants answered an interrogatory that outlined

3   exactly how data can be matched across the different

4   databases.  There is not going to be a question about Dr.

5   Albright's methods or how data was combined or how it was

6   prepared.

7          The only question here is as to the ultimate

8   conclusions in the data; that being how they were counted and

9   what they add up to, but there is no real debate and the jury

10  does not need anyone with specialized knowledge to explain to

11  them how this was created.  The parties agree.

12         What is really at issue here is really just Dr.

13  Albright's use of a specialized computer program that is

14  similar to Excel but for larger volumes of data.  If the

15  volume here was smaller, there would be no issue.  This is

16  simply counting and adding transactions.  Defendants believe

17  that that testimony can be presented under Rule 1006.

18  Plaintiffs themselves have described this as a technical

19  function and that is exactly what it is.  Dr. Albright has

20  admitted that he is not going to testify that these are

21  damages or that there is certain causation among the numbers.

22  It is simply going to be a summary and that is permitted under

23  Rule 1006 and that is what we suggest Dr. Albright should be

24  permitted to testify as and only as.

25         I think the two cases we cited in our motion, *Deere &*

5

1  *Co.* and *Master-Halco* are both on point.  In those cases the

2  witnesses at issue were simply adding up invoices, calculating

3  totals, in some cases applying percentages.  Those are exactly

4  the same functions that Dr. Albright performed on defendant's

5  data here.

6          As for plaintiff's assertion that another Judge in

7  this District under the *Liotine* case admitted Dr. Albright as

8  an expert --

9          THE COURT:  He is my boss you know.

10          MS. DeSHANO:  I do.

11          THE COURT:  Then I've got him for seven years.  He is

12  under my thumb then.  I might banish him to do prisoner work

13  for the rest of his legal career.

14          MS. DeSHANO:  In that case, Your Honor, I think it is

15  important to distinguish that plaintiff's counsel, who was

16  presenting Dr. Albright in that case, was presenting him under

17  Rule 1006 as we're suggesting and in that case the defendants

18  were objecting saying he is really an opinion witness and

19  there Judge Reardon said --

20          THE COURT:  Herndon.  Related to the Lincoln Herndon

21  group.

22          MS. DeSHANO:  I understand.

23          There, Your Honor, what the Court found, he was not

24  going to provide any expert opinions and that he would only be

25  considered an expert under Rule 702 as to how he gathered the

6

1    information for his testimony.  It was not admitted overall as

2    Rule 702 expert.  That was very different than what is

3    happening here.

4         Again, defendants are fine with Dr. Albright

5    presenting his testimony under Rule 1006.  We're not fine with

6    him being presented as an expert when there is no specialized

7    knowledge required here or needed and that will prejudice the

8    jury into giving his testimony more weight than it really is

9    due.

10        So for all of these reasons is why we have moved,

11   Your Honor, to exclude Dr. Albright as an expert, although

12   while permitting him to testify under Rule 1006.  I am happy

13   to answer any questions that Your Honor has on this issue.

14        THE COURT:  No, none.  On behalf of the plaintiff?

15        MR. MARTINS:  Good afternoon, Your Honor, Paul

16   Martins on behalf of the relator, Michael Yarberry, and the

17   plaintiffs.  It appears that we're -- I don't know if we're

18   talking past each other here, but all we're asking for is that

19   Dr. Albright receive the same treatment in this case as Judge

20   Herndon gave him in the *Liotine* case.  In that case Judge

21   Herndon found that Mr. Albright was an expert in order to

22   accomplish the task that he was asked to complete; that is he

23   has a specialized knowledge in the order of electronic

24   database management in order to merge the five or seven

25   different databases that the defendants have provided to then

7

1    make a master database and then to make inquiries of that

2    database using his expertise to draw out information that is

3    relevant to the issue in this case.

4            If I may, this table is in our response brief and at

5    page two I think it is, and what I am showing you are the size

6    and the complexity of the databases, particularly the formats.

7    You have the PDX database, which was the prescription, the

8    pharmacy database, and that was produced in a format called

9    Pipe Delimited.  It is 42.7 megabytes and there are 177,000

10   some odd lines of data.  Then you have the CDW database, which

11   is the customer data warehouse of K-Mart.  That was produced

12   in a different format, Tab Delimited, 249 Megabytes, 4,294,000

13   lines of data.  Then we have the K-Mart point of sale, POS

14   database.  That is a different format again, 156 Megabytes,

15   2.4 million lines of data.  Then we served interrogatories on

16   the defendants to try to just get an answer to the question.

17   The question throughout has been how many Government health

18   care program individuals received cash cards, how much were

19   the cash cards and what Government health care programs were

20   billed for reimbursement and received reimbursement and the

21   amounts.  That was it.

22           THE COURT:  That is what you want to prove with him?

23           MR. MARTINS:  Yes.

24           THE COURT:  Can we agree on that number?

25           MS. DeSHANO:  We may be able to ultimately.  I can

8

1   tell you we can agree on the process of how he is matching

2   this data because we already did in their data interrogatory.

3          THE COURT:  But you know your stipulation doesn't

4   have to be accepted.  If the answer is that there were 72,000

5   cards issued to people who ought not have had them or should

6   not have redeemed them and everybody agrees to that, and that

7   they were provided to X, Y, Z company, one got 22,000, one got

8   whatever, they all added up to the correct number, then we

9   don't need him, right?

10          MR. MARTINS:  That's right.  In fact, we have given

11   the defendants a series of summary charts that those were

12   prepared.  These are summaries from the master database, so

13   Dr. Albright goes through and uses various programs and

14   combines and matches data, comes up with a master database,

15   and then their inquiries -- this is a summary chart where he

16   goes through the payment, the payors, the insurance payors, so

17   if you look, Medicare Part D, and you have 97,000 some odd

18   transactions where there is or prescriptions -- I am sorry --

19   were processed where the Medicare Part D people received gift

20   cards, cash cards.  The amount of reimbursement from Medicare

21   was 4.6 million and then the number of prescriptions after

22   November 1st.  November 1st is when, as the Court knows from

23   the summary judgment, when they implemented an automatic flag

24   system.  We asked Dr. Albright to break it before and after

25   November 1st.

9

1      November 1st of '09, the prescriptions dropped by

2  about 90 percent.  They are now 9,000 prescriptions, 496,000,

3  total prescriptions of 106,000 and the total amount of

4  reimbursement from Medicare Part D is 5.1 million.  We have

5  provided that to counsel and it is broken out by all of the

6  different insurer types that are in the database.

7      So all we're asking is that he is going to have to

8  explain to the jury -- the jury is going to have to understand

9  the process by which he used his expertise in order to derive

10  the information.  He is going to have to walk the jury through

11  a couple of examples and we have examples.  He can tell you

12  the name of a person, the date and time the prescription was

13  filled, the amount of the cash card that was given in

14  conjunction with filling the prescription, what the

15  prescription was for and the amount of reimbursement that was

16  received from Medicare, Medicaid, State, whatever, and he can

17  identify that, but, obviously, when you are dealing with

18  millions and millions of transactions, you need a summary and

19  that is where his expertise comes in and what we're

20  envisioning is he would explain to the jury several

21  individuals so they understand the process that he goes

22  through and then give them the summary charts and he can see

23  or the jury can then see this is the number, this is the

24  number before November 1st, this is the number after

25  November 1st, do they want to consider all of those, do they

1  want to consider part of them.  The jury can do what it wants,

2  but he is an expert under 702 and Judge Herndon recognized him

3  as such under 702.  He is an expert programmer.  His resume

4  and qualifications have been submitted to the Court so he

5  qualifies in all aspects of 702.

6        There is no challenge from the defendant as to the

7  typical Daubert criteria.  They are not saying what he is

8  offering to the jury is irrelevant.  They are not saying he is

9  unreliable, so all of those matters are disposed of.  What

10  they just don't want is to have the jury know that he is an

11  expert in data management and that is important if they are

12  going to understand the summaries that he is going to present

13  to them.

14        So that is it.  I mean we're not -- we're asking

15  expressly that he be treated exactly as Judge Herndon did.

16  What he is going to put into evidence are 1006 summaries.  He

17  gives no opinion on whether or not Medicare should be covered

18  or should be part of the damages.  He is just saying I have

19  looked at the database, I have drawn these items of data and

20  here are the summaries.  So that is all we're asking and we

21  ask the Court to treat him in the same fashion as Judge

22  Herndon.

23        We will note that the defendants today are still

24  producing data to us and we're expecting today to receive data

25  from the defendants concerning an insurance company called

1    Silver Script.  It is a CVS company and initially they were

2    identified as a private company.  We have since learned that

3    they are a Medicare Part D provider.  They have about

4    4,000,000 Medicare Part D people enrolled and so that data we

5    have asked for, the defendants are gathering that and that is

6    coming to us today.  Once we receive that, the numbers I have

7    just shown you in the summary will probably have to be altered

8    again by Dr. Albright.  He'll do it as soon as he can.

9    Usually takes him about a week or two to get it and do his

10   checking back and forth.

11          Another thing that highlights the importance of his

12   expertise, when he first tried to use the data that the

13   defendants had produced, which was the PDX, PBS data.

14   Initially what was produced were the first three, PDX, CDW and

15   KPOS.  He explained and we highlighted in the deposition or

16   the motions he explained at his deposition that the PDX and

17   Pipe Delimited is an obscure format for recording data and it

18   posed a problem in that the computer system had trouble -- had

19   trouble figuring out where one line of data ended and another

20   line of data started.  The result when he did his initial

21   analysis was that it severely undercounted the amount of

22   reimbursement and the number of prescriptions and the number

23   of transactions.

24          He discovered that or because of his expertise he was

25   able to formulate another software program or use another

1    software program to cure this problem and then take that data

2    and manage it in such a fashion that he could draw it with the

3    CDW and the KPOS data and start to answer some of the

4    questions.

5         So his expertise -- there is no reason why he is not

6    an expert.  He has been disclosed as an expert.  His report

7    complies with the Civil Procedure Rules on an expert and he

8    has been deposed and Magistrate Judge Frazier found that he

9    was an expert for purposes of requiring that the defendants

10   pay him his fee and time as we have paid him his fee and time

11   in conducting his work.

12        Unless there are any other questions?

13        THE COURT:  Not on this point.  Your response?

14        So he has compiled this data and is going to testify

15   according to his summary, which you say is okay.  Does anyone

16   on your side intend to challenge his credibility on the way he

17   compiled the data or whether it is accurate or not?

18        MS. DeSHANO:  No, that is exactly the point we're

19   making.  The parties already agreed on the method.  We

20   provided -- first of all, we provided recombined data on

21   several occasions to plaintiffs in response to their

22   interrogatory from the original three databases that we

23   produced.  We have also -- the parties have agreed on the

24   method to match the data that was already produced.

25   Defendants put it in an interrogatory answer, interrogatory 9D

1   that we revised about a month ago after we had a conversation

2   about it.  The whole point of us providing that answer and

3   providing it to plaintiff was so there would be no debate on

4   how Dr. Albright's summaries were compiled.  That is not going

5   to be an issue.

6           THE COURT:  Are the conclusions an issue?

7           MS. DeSHANO:  The conclusions are only an issue to

8   the extent that there are significant categories of

9   transactions.  For example, OTG cards that we don't think

10  should be included.  That is really more of a legal argument.

11  We don't have an issue how he calculated them or how he

12  counted them.  We actually gave Dr. Albright and plaintiffs

13  the direction on how to combine the data and how to count it.

14  So whatever he was an expert for in the CDW case I think has

15  been resolved here by agreement.  Again I am not sure what Dr.

16  Albright really isn't going to be able to testify to.  He can

17  present these tables that plaintiff has suggested.  We just

18  don't think they should be presented under the cloak of an

19  expert.  They are summaries based on a process that we

20  provided.

21          THE COURT:  But he had to have expertise to combine

22  the databases to come to the summaries, did he not?

23          MS. DeSHANO:  Well, he used a software program.

24  Perhaps it is not as well known as Microsoft Excel, but the

25  process is the same if this were a smaller volume of data.

14

1          THE COURT:  Let me ask you this.  PDX, what is that?

2          MS. DeSHANO:  Pharmacy data management that K-Mart

3     uses.   It is for HIPPA reasons it has to be outside of the

4     normal sales.

5          THE COURT:  Give me the names of the Government plans

6     that you allege should not have had the gift cards, CHAMPUS or

7     --

8          MR. MARTINS:  Medicare Part D.

9          MS. DeSHANO:  Or even Medicaid of Illinois.

10          THE COURT:  Let's say Medicaid of Illinois.  Do you

11    all agree on the total number of cards that were issued

12    without this man's testimony?

13          MS. DeSHANO:  Your Honor, I don't know that we might

14    not ultimately agree.  I can't agree today.

15          THE COURT:  You answered my question.  Okay.  I am

16    going to deny the Motion to Exclude.  I am going to be

17    consistent with Judge Herndon's ruling, which I spent a lot of

18    time on.

19          MS. DeSHANO:  Just for my clarification, will then

20    Dr. Albright's expertise be limited as it was in the other

21    case?

22          THE COURT:  I only rule on what is in front of me and

23    that is a Motion to Exclude and that motion is denied.  Now if

24    there are other motions with respect to the scope of what he

25    is going to say, I will take them up when they are raised, but

1    I am not going to parse my ruling.

2          MS. DeSHANO:  It will be subject to however plaintiff

3    chooses to present him at trial.

4          THE COURT:  Until I hear it --

5          MS. DeSHANO:  We can raise it at that point.

6          THE COURT:  Let me tell you where we are at now.  If

7    you were here for my 1:30, you saw someone refuse to plead who

8    was going to plead in a case set for trial the 9th of

9    December.  That case is now going, so now there are three

10   criminal cases in front of you.  Whether they settle or not, I

11   don't know.  We have to be ready.  I still have you on the

12   docket for the 2nd.  There is no civil case that is going to

13   fight you because you got the oldest civil case, but these

14   criminal cases are just driving me to distraction, to put it

15   mildly.

16         So we will be ready to go on the second.  We'll keep

17   you advised we'll have the final pre-trial as scheduled.  I

18   know the motions in limine are coming in.  I am going to get

19   you a written ruling on the Motion to Exclude, but having had

20   to work for a living like you all do, knowing you want early

21   rulings rather than a later ruling in writing I am telling you

22   when they come in.  Even on the Motion in Limine, I might

23   grant or deny with an indication and I will justify it on the

24   record later.  That means you get as much notice as possible.

25   You are going to know at least a weekend before trial what the

1    rulings are.

2          I would invite you to send me some proposed voir dire

3    questions.  Ordinarily I permit the parties to do voir dire,

4    but because of the time limitations we're going to be under,

5    I'll conduct the voir dire.  I'll do a thorough one.  If you

6    want to send me proposed voir dire questions with copies to

7    the other side, you can just mail them.  You don't need to run

8    through the electronic filing system.

9          MS. DeSHANO:  I believe the typical deadline would be

10   Monday.  Is that still correct?

11         THE COURT:  I just need them the weekend before

12   trial.  If you get them to me by close of business Friday, if

13   I could have a physical copy at that time.  Actually what you

14   might do, Blaire will give you her e-mail address.  That way

15   she can e-mail them to me so I don't have to be in that

16   Friday.

17         MS. DeSHANO:  That is the Thanksgiving holiday.

18         THE COURT:  I started at 4:00 this morning, went to

19   the gym and our Clerk of Court was already there.  That is

20   what we do.  So, no, that is not a problem at all.  If you

21   could get together, and I'll tell you in looking to the final

22   pre-trial, looking in advance, I'll want one combined witness

23   list.  I know you have your witnesses, they have theirs, but

24   if you give me a combined one so I don't mention Mr. Yarberry

25   twice, once from your list and once from their list.  Doesn't

1    have to be fancy.  You can handwrite it.

2           An agreed to statement of the case would be helpful

3    that I can read to the jury.  I am happy to tell you anything

4    now about how I handle cases.  I go through it in detail at

5    the final pre-trial but if you have any specific questions you

6    want to ask me now in advance of that, I'm happy to answer

7    that.

8           MS. DeSHANO:  You want both items at the Final

9    Pre-Trial?

10          THE COURT:  Yes.

11          MS. DeSHANO:  With respect to the exhibit list, is it

12   your understanding that we would exchange those ahead of time

13   and have objections worked out?

14          THE COURT:  Don't put any objections -- I hear

15   objections from the bench.  I know there is a place for

16   objections or not.  If you don't object and you want to check

17   that, that will help because then as you are using the

18   document I am going to know there is no objection, so that

19   would be helpful.  If there is an objection, don't bother

20   checking the objection.  If there is no objection, you might

21   put it somewhere.  That might make things smoother.  Are we

22   talking about a lot of documents that actually are going to be

23   admitted?

24          MR. MARTINS:  I don't think we'll have more than --

25   there'll be summaries, but I doubt we'll have more than 40 or

1    50 documents.

2         MS. DeSHANO:  I think we'll have around the same

3    number, so is the thought we would exchange those before?

4         THE COURT:  It is up to you.

5         MS. DeSHANO:  We don't have to.

6         THE COURT:  No.  You don't have to tell each other

7    who the witnesses are going to be the next day.  I always

8    encourage that, because life is too short.  Why stay up all

9    night preparing for John Jones when it is Sally who is

10   testifying.  I don't force it.  It is up to you.

11        MR. MARTINS:  We'll do that with the defendants

12   because a lot of the people we're going to call are going to

13   be the defendant's witnesses anyway, so we will do that.

14        THE COURT:  Sure.

15        MS. DeSHANO:  That raises one issue.  I spoke with

16   your clerk about this this morning.  I sympathize with your

17   docket and it looks extremely overwhelming.  Because a lot of

18   the witnesses plaintiff wants to call are Sears employees,

19   some of them are former employees that are now living

20   elsewhere, working elsewhere, and while we're certainly

21   working with plaintiff to get them here, the concept that they

22   may have to be here and then not be here on the 2nd and we

23   don't know when they have to come back is raising some

24   practical issues.  We are trying to reserve hotel rooms.

25   We're going to have a lot of costs.  My team will be here at

19

1    your leisure, but because of the people that are now third

2    parties, I am trying to get some idea if we don't go on the

3    2nd, what should we expect will happen after that?

4              THE COURT:  I swear, I wish I could tell you.  If you

5    don't go the on the 2nd, I am hoping to get you out the 9th or

6    the 16th.  It is just week by week is the problem.  Believe

7    me, that is why one suggestion was you consider having the

8    Magistrate do it.  You can pick the two weeks you want to try

9    the case, you can book your experts and hotels and flights.

10   Now maybe the way I ruled, you'll agree to consent.

11             MS. DeSHANO:  Maybe.

12             THE COURT:  You might not though.

13             MS. DeSHANO:  Okay.

14             THE COURT:  No, I was just kidding.  The calendars

15   are so much different, the Magistrates don't have the criminal

16   issues I have.  Only I can sentence and handle criminal

17   trials.

18             MS. DeSHANO:  I understand.  If the consenting to the

19   Magistrate, is that a general consent or consent to a specific

20   magistrate or would it be assigned?

21             THE COURT:  It would not be Frazier because he knows

22   secrets apparently.  By the way, he and I do not talk about

23   settlement.  He and I don't talk about that whatsoever.  I

24   don't want to know.  It is none of my business.  It would be

25   either Judge Williams or Judge Wilkerson in this courthouse.

20

1    We can do it two ways.  You can all agree on who it is and I

2    will assign it, or if you can't agree but agree you want a

3    magistrate, I'll have what we call a spin the wheel where

4    downstairs the Clerk of the Court has a deck of cards and one

5    name will come up and that is who it is assigned to.

6          MS. DeSHANO:  All right, I appreciate that, Your

7    Honor.  Thank you.

8          MR. MARTINS:  I have one question.  Did I understand

9    you the attorneys will not do voir dire?

10          THE COURT:  Correct.  I do it only because when you

11    told me it was going to take five to seven days, all of a

12    sudden I realized I am into another week.  If I do it, I'll

13    streamline it.  I assure you it is a thorough voir dire I am

14    not going to let you fall in love with every juror like I

15    normally do.

16          MR. MARTINS:  That is fine.  Thank you.

17          THE COURT:  Okay, thanks for coming.  We'll be in

18    touch.  Feel free to call Blair anytime.  She loves phone

19    calls.

20          What happens is criminal cases start dropping off as

21    we get closer.  The one I had today should have dropped off

22    and I could have told you now I only got ten set.  Well, I

23    still have eleven set and an additional one is probably going

24    to go to trial.  As we get closer they tend to drop off.  We

25    have an unusually large number set the 2nd and the 9th we

1  usually have five or six and I think we have ten or eleven.

2  That is because we have taken over Judge Stiehl's criminal

3  docket and Judge Murphy's criminal docket.  The two

4  magistrates, frankly, are smarter than I am.

5          MS. DeSHANO:  I am sure that is not true.

6          THE COURT:  It is.  They just don't have the politics

7  that I had.  Okay, thanks for coming.  Take care.

20      (Court is adjourned.)

22          I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.

23

   SS/Barbara Kniepmann                    December 10, 2013

24

25